| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 3:17-cr-00065 (SRU) |
| HAROLD COOK, GERUND MICKENS, TERRELL HUNTER, DOUGLAS LEE, and JESUS ASHANTI. | |

## RULING ON MOTIONS TO DISMISS, JOINT MOTION TO STRIKE, MOTIONS TO SEVER, AND MOTIONS TO SUPPRESS

Defendants Harold Cook, Gerund Mickens, Terrell Hunter, Douglas Lee, and Jesus Ashanti are charged with crimes stemming from the kidnapping, robbery, and murder of Charles Teasley in Hartford, Connecticut on January 9, 2009. The indictment charges the defendants with kidnapping resulting in the death of a person, in violation of 18 U.S.C. § 1201(a)(1) & (2) (Count One); with firearm-related murder and kidnapping, in violation of 18 U.S.C. §§ 924(c), 924(j)(1) & (2), 1111(a), & 1201(a)(1) & (2) (Count Two); and with firearm-related murder and Hobbs Act robbery, in violation of 18 U.S.C. §§ 924(c), 924(j)(1) & (2), 1111(a), & 1951(a) (Count Three). The defendants have filed a number of pretrial motions, which include: (a) motions to dismiss the indictment (or various counts thereof) filed by defendants Gerund Mickens (Docs. Nos. 137, 139, & 143) and Douglas Lee (Doc. No. 148); (b) motions to sever trial filed by defendants Harold Cook (Doc. No. 145), Terrell Hunter (Docs. Nos. 136 & 151), and Douglas Lee (Docs. Nos. 120 & 146); (c) motions to suppress evidence filed by defendants Gerund Mickens (Doc. No. 102) and Terrell Hunter (Doc. No. 130); and (d) a joint motion to strike surplusage from the indictment filed by all defendants except Jesus Ashanti (Doc. No. 141). For

the following reasons, I grant Lee's second motion to sever, Doc. No. 146; deny as moot his first motion to sever, Doc. No. 120; and deny all of the defendants' other motions.

## I.    Background

On January 12, 2009, the body of Charles Teasley was discovered by his friend, Desmond Wright, in a car parked on Colebrook Street in Hartford, Connecticut. Teasley, a known drug dealer, had been shot multiple times in the head.

On March 30, 2017, Harold Cook, Gerund Mickens, Terrell Hunter, Douglas Lee, and Jesus Ashanti were all charged in a three-count indictment with Teasley's kidnapping, robbery, and murder. According to the allegations in the indictment, Lee set up Teasley to be robbed by arranging to buy cocaine from him and providing Cook with the details of the planned transaction. When Teasley went to meet Lee, he was ambushed by Cook, Mickens, Hunter, and Ashanti, who kidnapped Teasley by binding his hands with zip-ties and forcing him into the back of his car. Cook, Mickens, Hunter, and Ashanti then assaulted Teasley; forced him to telephone his girlfriend, who brought the defendants a safe hidden at Teasley's residence; and finally murdered Teasley by shooting him in the head at close range.

On March 31, 2017, the court issued warrants for the defendants' arrest. Cook, Mickens, and Hunter were all arrested on April 4, 2017; Lee was arrested on April 6, 2017; and Ashanti was arrested on April 11, 2017. The case was transferred to me by Senior United States District Judge Alfred V. Covello on January 25, 2018.

## II.    Discussion

The defendants' motions fall into four categories. First, Mickens and Lee move to dismiss the indictment (or portions thereof) on grounds of preindictment delay, multiplicity of charges, or failure to state an offense. *See* Docs. Nos. 137, 139, 143, & 148. Second, all of the

defendants except Ashanti move to strike surplusage from the indictment. Doc. No. 141. Third, Cook, Hunter, and Lee each move to sever trial from the other defendants. Docs. Nos. 120, 136, 145, 146, & 151. Fourth, Mickens and Hunter move to suppress evidence of statements and/or silences they made after their arrest. Docs. Nos. 102 & 130. I will address each category in turn.

A. <u>Motions to Dismiss</u>

Federal Rule of Criminal Procedure 12(b)(3) sets forth various defenses and objections that "must be raised by pretrial motion." Those defenses include "defect[s] in instituting the prosecution," such as "preindictment delay," Fed. R. Civ. P. 12(b)(3)(A)(ii), as well as "defect[s] in the indictment," such as "charging the same offense in more than one count (multiplicity)," Fed. R. Crim. P. 12(b)(3)(B)(ii), and "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v).

Here, Mickens moves to dismiss the indictment pursuant to Rule 12(b)(3)(A)(iii) due to unjustified and prejudicial preindictment delay. He also moves to dismiss Count One of the indictment pursuant to Rule 12(b)(3)(B)(ii) as multiplicitous, and to dismiss Count Two of the indictment pursuant to Rule 12(b)(3)(B)(v) for failure to state an offense. In addition, Lee moves to dismiss Count Three pursuant to Rule 12(b)(3)(B)(v) for failure to state an offense.

I deny all four motions to dismiss.

1. *Preindictment delay*

Because "the statute of limitations is 'the primary guarantee against bringing overly stale criminal charges,'" *United States v. Cornielle*, 171 F.3d 748, 751 (2d Cir. 1999) (quoting *United States v. Marion*, 404 U.S. 307, 322 (1971)), "actions brought within the limitations period will

rarely be dismissed" for preindictment delay.[1] *United States v. Lawson*, 683 F.2d 688, 694 (2d

Cir. 1982). In extreme cases, however, "'[o]ppressive' prosecutorial delay may violate the Due

Process Clause of the United States Constitution."[2] *Bierenbaum v. Graham*, 607 F.3d 36, 51 (2d

Cir. 2010) (quoting *United States v. Lovasco*, 431 U.S. 783, 789 (1977)). The defendant

"carr[ies] a heavy burden to sustain a claim of violation of due process." *United States v.*

*Elsbery*, 602 F.2d 1054, 1059 (2d Cir. 1974). He or she "must prove that the delay resulted in

actual prejudice and that the prosecution's reasons for the delay were improper." *Bierenbaum*,

607 F.3d at 51.

　　Mickens has shown neither actual prejudice nor improper government conduct. In

support of his claim of prejudice, Mickens vaguely speculates that "investigative pathways . . .

have gone cold simply due to the passage of time, the fading of memories, and the scattering of

those who might remember." Mem. Supp. Mickens' Mot. Dismiss, Doc. No. 138, at 3. But

although "actual prejudice" may be "demonstrated by the loss of documentary evidence or the

unavailability of a key witness," *Cornielle*, 171 F.3d at 752, the simple fact that "witnesses'

memories [have] dimmed . . . has not been considered the sort of actual substantial prejudice"

that might violate due process. *Elsbery*, 602 F.2d at 1059. "Faded memories or unavailable

witnesses are inherent in any delay, even if justifiable." *United States v. Delacruz*, 970 F. Supp.

---

[1] The offenses with which the defendants are charged are punishable by death, so no statute of limitations applies. *See* 18 U.S.C. § 3281.

[2] The relevant provision is the Due Process Clause of the Fifth Amendment, rather than the Speedy Trial Clause of the Sixth Amendment, because the latter only applies upon "a formal indictment or information or else the actual restraints imposed by arrest." *United States v. Marion*, 404 U.S. 307, 320 (1971). Thus, the Speedy Trial Clause is "wholly irrelevant" to the issue of "a lengthy preindictment delay." *United States v. Lovasco*, 431 U.S. 783, 788 (1977).

2d 199, 202 (S.D.N.Y. 2013). Thus, to warrant dismissal, "a defendant must demonstrate a substantial, actual prejudice to his ability to defend himself." *Id.*

Mickens' only example of an unavailable "key witness" is Desmond Wright, the man who discovered Teasley's body and an early suspect in Teasley's murder. Wright died in 2015, which means that the defendants "had no opportunity ever to question [him]" and "will have no ability at trial to call him to the stand." Mem. Supp. Mickens' Mot. Dismiss, Doc. No. 138, at 3. But Mickens' brief is extremely "light on details that support [Wright]'s label as a 'key witness.'" *Delacruz*, 970 F. Supp. 2d at 203. In fact, Mickens does not assert *anything* that Wright might have known that would have made him a significant witness for the defense. *Cf. United States v. Guerra*, 2012 WL 1899861, at *5 (E.D.N.Y. May 24, 2012) ("Defendant cannot provide definite evidence of prejudice by merely stating that unidentified people may have known and testified to unknown and unspecified evidence."). Because there is "no way of knowing what [Wright's] testimony would have been," any prejudice from his absence is, at best, highly "speculative." *See United States v. Long*, 697 F. Supp. 651, 657 (S.D.N.Y. 1988).

Mickens also has not shown that "the delay was engineered by the government for an improper purpose, such as gaining a tactical advantage." *Lawson*, 683 F.2d at 694; *see also Lovasco*, 431 U.S. at 790 ("[T]he due process inquiry must consider the reasons for the delay as well as the prejudice to the accused."). Mickens argues that "there is no apparent legitimate reason why the Government let the case grow cold before bringing the present indictment,"[3] and claims that the prosecution "intends to rely substantially on information it obtained *seven years*

---

[3] In fact, the government appears to have an entirely legitimate reason for the delay, namely, "the existence of a cooperating witness . . . who only recently became available." *Cf. United States v. Guerra*, 2012 WL 1899861, at *6 (E.D.N.Y. May 24, 2012).

ago in early 2011 as well as material arising from the initial investigation of Teasley's death in 2009." Mem. Supp. Mickens' Mot. Dismiss, Doc. No. 138, at 3–4. But "[t]here is no constitutional right to be arrested," *Hoffa v. United States*, 385 U.S. 293, 310 (1966), and "prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt."[4] *Lovasco*, 431 U.S. at 791. Absent any showing of an "improper purpose" on the part of the government, *Cornielle*, 171 F.3d at 752, even actual prejudice from a lengthy delay—which Mickens has not shown—would not violate due process. *See Lovasco*, 431 U.S. at 796. ("[T]o prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time.").

To be sure, an eight-year delay between the crime and the indictment is "somewhat unusual." *See Delacruz*, 970 F. Supp. 2d at 203. But considerably longer delays have been held not to violate due process in the absence of government misconduct. *See, e.g., id.* (sixteen-year preindictment delay did not violate due process because defendant failed to "show[] that the preindictment delay was an intentional device designed by the Government to gain a tactical advantage"); *Guerra*, 2012 WL 1899861, at *5 (seventeen-year preindictment delay did not violate due process). Here, because Mickens has shown neither actual prejudice nor improper conduct by the government, I deny the motion to dismiss on the basis of preindictment delay.

---

[4] For obvious reasons, "no one's interests would be well served by compelling prosecutors to initiate prosecutions as soon as they are legally entitled to do so." *Lovasco*, 431 U.S. at 791. Defendants likely would be subject to a greater number of unwarranted prosecutions; law enforcement officers would be unable to develop additional evidence after probable cause was met; and courts would be forced to expend "scarce resources . . . on cases that prove to be unsubstantial." *Id.* at 791–92.

2. *Multiplicity*

The Double Jeopardy Clause of the Fifth Amendment provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." The provision "encompasses three distinct guarantees: '(1) It protects against a second prosecution for the same offense after acquittal. (2) It protects against a second prosecution for the same offense after conviction. (3) And it protects against multiple punishments for the same offense.'" *United States v. Josephberg*, 459 F.3d 350, 354–55 (2d Cir. 2006) (per curiam) (quoting *Illinois v. Vitale*, 447 U.S. 410, 415 (1980)). To determine whether two criminal charges constitute the same offense for purposes of double jeopardy, courts apply the "same-elements test" set forth in *Blockburger v. United States*, 384 U.S. 299 (1932). That test "inquires whether each offense contains an element not contained in the other; if not, they are the 'same offence' and double jeopardy bars additional punishment and successive prosecution."[5] *Dixon*, 509 U.S. at 696.

"Where there has been no prior conviction or acquittal," however, "the Double Jeopardy Clause does not protect against simultaneous *prosecutions* for the same offense, so long as no more than one punishment is eventually imposed." *Josephberg*, 459 F.3d at 355 (emphasis added); *see Ball v. United States*, 470 U.S. 856, 860 n.7 (1985) ("[T]he Double Jeopardy Clause imposes no prohibition to simultaneous prosecutions."). In other words, "a defendant's Double Jeopardy rights are only at risk after he is *convicted* on multiplicitous charges." *United States v. Ferguson*, 478 F. Supp. 2d 220, 233 (D. Conn. 2007) (Droney, J.) (emphasis added). Until such time as a conviction or an acquittal has entered, "the Double Jeopardy Clause's guarantee against

---

[5] "With respect to cumulative sentences imposed in a single trial," the *Blockburger* test is merely "a rule of statutory construction." *Missouri v. Hunter*, 459 U.S. 359, 366–67 (1983). Courts assume that "Congress *ordinarily* does not intend to punish the same offense under two different statutes." *Id.* at 366. Where the legislature clearly does "intend[] . . . to impose multiple punishments," however, "imposition of such sentences does not violate the Constitution." *Albernaz v. United States*, 450 U.S. 333, 344 (1981).

multiple punishments for the same offense has not yet been triggered." *United States v. Polouizzi*, 564 F.3d 142, 157 (2d Cir. 2009).

Mickens moves to dismiss Count One of the indictment on the basis that it "contains no element not also contained in Count Two." *See* Mickens' Mot. Dismiss Count One, Doc. No. 139, at 1. Mickens' motion is "premature," however, "for it is possible that the jury will convict [Mickens] on one count and acquit on all other allegedly multiplicitous counts." *See Josephberg*, 459 F.3d at 356. In the event that the jury convicts Mickens on both Counts One and Two, his "right not to suffer multiple punishments for the same offense will be protected by having the court enter judgment on only one of the multiplicitous counts." *Id.* at 355. Therefore, I deny Mickens' motion to dismiss Count One without prejudice to renewal should he be convicted on both allegedly multiplicitous counts.

3. *Failure to state an offense*

Mickens moves to dismiss Count Two (firearm-related murder/kidnapping) for failure to state an offense. Lee moves to dismiss Count Three (Hobbs Act robbery) for the same reason.

a. Count Two

Mickens claims that Count Two, which charges a violation of 18 U.S.C. § 924(j), fails to state an offense. Section 924(j) imposes additional penalties for certain violations of section 924(c). Section 924(c), in turn, "requires, as an element of the offense, that Defendants have committed a 'crime of violence.'" Mem. Supp. Mickens' Mot. Dismiss Count Two, Doc. No. 144, at 1. Section 924(c)(3) defines a "crime of violence" as:

> an offense that is a felony and—
>
> > (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

> (B) that by its nature, involves a substantial risk that physical force
> against the person or property of another may be used in the course of
> committing the offense.

The Second Circuit has referred to clause (A) as the "force clause" and clause (B) as the "risk-of-force clause." *See United States v. Hill*, __ F.3d __, 2018 WL 2122417, at *2 (2d Cir. 2018).

Section 923(c)(3)'s risk-of-force clause is similar (though not identical to) the "residual clause" of the Armed Career Criminal Act, 18 U.S.C. § 924(e)(2)(B), which the Supreme Court held unconstitutionally vague in *Johnson v. United States*, __ U.S. __, 135 S. Ct. 2551 (2015). The Court recently decided *Sessions v. Dimaya*, in which it held that the Immigration and Nationality Act's definition of aggravated felony—which is identical to section 923(c)(3)'s risk-of-force clause—is unconstitutionally vague under *Johnson*. *See* __ U.S. __, 138 S. Ct. 1204 (2018). Mickens asserts that I should apply *Johnson* and *Dimaya* to hold that all of section 924(c) is unconstitutionally vague and cannot support a conviction under section 924(j).

Mickens' motion must be denied, because the Second Circuit has spoken on this precise issue. In *United States v. Hill*, 832 F.3d 135 (2d Cir. 2016), an appeal from a conviction under 18 U.S.C. § 924(j), the Second Circuit held that Hobbs Act robbery qualified as a crime of violence under either section 923(c)(3)'s force clause or its risk-of-force clause. The Court rejected the defendant's argument that *Johnson* rendered both clauses unconstitutionally vague. Subsequently—after *Dimaya* suggested that section 923(c)(3)(B) was, in fact, unconstitutionally vague—the Second Circuit amended and superseded its opinion in *Hill*. It now held that Hobbs Act robbery categorically constitutes a crime of violence under section 923(c)(3)'s force clause. *See* 2018 WL 2122417, at *1. The Second Circuit specifically distinguished *Dimaya*, which addressed only the language used in section 923(c)(3)'s risk-of-force clause. *Id.* n.2.

Although Mickens asserts that "[t]he long-term status of *Hill* . . . is uncertain," I am bound by prior decisions of the Second Circuit "unless and until the precedents established

therein are reversed *en banc* or by the Supreme Court." *See United States v. Jass*, 569 F.3d 47, 58 (2d Cir. 2009). Accordingly, I deny Mickens' motion to dismiss Count Three. Mickens may renew his motion should *Hill* be reversed by the Second Circuit sitting *en banc* or by the Supreme Court.

b.   Count Three

Lee moves to dismiss Count Three, which charges a violation of the Hobbs Act, 18 U.S.C. § 1951, on the basis that "the crime charged involves a robbery and killing of a private individual, without a jurisdictional nexus apparent from any of the discovery material." Mem. Supp. Lee's Mot. Dismiss Count Three, Doc. No. 148, at 1. That objection is meritless. It is certainly true that "[p]roving an effect on interstate commerce is . . . an element of a Hobbs Act offense, which must be proven beyond a reasonable doubt to a jury." *United States v. Parkes*, 497 F.3d 220, 227 (2d Cir. 2007). But because "the reach of the Hobbs Act is coextensive with that of the Commerce Clause of the United States Constitution," *id.* at 230 n.8 (internal quotation marks omitted), "the required showing of an effect on interstate commerce is *de minimis.*" *Id.* at 230. Even a "very slight, . . . potential[,] or subtle effect on commerce will suffice." *Id.*

Like any indictment, a charge of violating the Hobbs Act "need do little more than to track the language of the statute . . . and state the time and place (in approximate terms) of the alleged crime." *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998). With respect to "an indictment alleging a violation of the Hobbs Act" in particular, the Second Circuit has held that the charges need not "specify the precise nature of the effect upon interstate commerce that the government intends to prove at trial." *Id.* Instead, the indictment may "allege[] in conclusory terms that [the] defendants conspired to commit robbery and thereby affected interstate commerce." *Id.* An indictment meets those "basic pleading requirements" when, for example, it

"alleges that defendants 'conspired to commit robbery, as that term is defined [in the Hobbs Act],' and that they 'thereby obstructed, delayed and affected commerce and the movement of articles and commodities in commerce.'" *Id.*

The Supreme Court recently reaffirmed the "unmistakably broad . . . sweep" of the Hobbs Act in *Taylor v. United States*, __ U.S. __, 136 S. Ct. 2074, 2079 (2016). In that decision, the Court concluded that "the prosecution in a Hobbs Act robbery case . . . need not show that the drugs that a defendant stole or attempted to steal either traveled or were destined for transport across state lines." *Id.* at 2077, 2081. Rather, because "the Commerce Clause gives Congress authority . . . to proscribe the purely intrastate production, possession and sale of [ ] controlled substance[s]," *id.* at 2077 (citing *Gonzalez v. Raich*, 545 U.S. 1 (2005))—and the Hobbs Act "criminalizes robberies and attempted robberies that affect any commerce 'over which the United States has jurisdiction,'" *id.* (quoting 18 U.S.C. § 151(b)(3))—the Supreme Court held that the government "satisfies the Act's commerce element if it shows that the defendant robbed or attempted to rob a drug dealer of drugs or drug proceeds." *Id.* at 2077–78. Thus, the government's burden may be met through evidence that a "gang intentionally targeted drug dealers to obtain drugs and drug proceeds." *Id.* at 2081.

Especially in light of *Taylor*, the indictment in this case satisfies the Hobbs Act's "basic pleading requirements." *Alfonso*, 143 F.3d at 776. Count Three alleges that the defendants "knowingly and intentionally obstruct[ed], delay[ed,] and affect[ed] commerce, and the movement of articles and commodities in commerce, by robbery," Indictment, Doc. No. 1, at 5, in language that almost exactly tracks the Hobbs Act. *See* 18 U.S.C. § 1951(a). The indictment further alleges that the defendants other than Lee "were involved together in committing armed robberies of persons they believed to be drug dealers," and that Lee "provided the particulars of

the planned transaction to Cook so that Teasley could be kidnapped and robbed of drugs, money[,] and proceeds from drug transactions and drug related activities." Indictment, Doc. No. 1, at 1–2. Finally, the indictment "state[s] the time and place (in approximate terms) of the alleged crime," namely, January 9, 2009 in Hartford, Connecticut. *See Alfonso*, 143 F.3d at 776.

In short, Count Three "charges [the] crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events." *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992). It also alleges the minimal jurisdictional facts that the government is required to prove under *Taylor*, 136 S. Ct. 2074, to satisfy the Hobbs Act's commerce element. Because Count Three sufficiently states an offense, I deny Lee's motion to dismiss.

B.  <u>Motion to Strike</u>

All defendants except Jesus Ashanti jointly move pursuant to Federal Rule of Criminal Procedure 7(d) to strike surplusage from the indictment. Specifically, the defendants move to strike paragraph two of the indictment, which reads as follows:

> COOK, MICKENS, HUNTER and ASHANTI were involved together in committing armed robberies of persons they believed to be drug dealers operating in and around the greater Hartford, Connecticut area.

Indictment, Doc. No. 1, at 1. The defendants also move to strike the aliases listed in the indictment, namely, "Oink" for Harold Cook, "Breeze" for Gerund Mickens, "Rell" and "Killer" for Terrell Hunter, "Fly" for Douglas Lee, and "Black" for Jesus Ashanti. *See id.*

1.  *Surplusage*

The defendants move to strike paragraph two of the indictment, which (they contend) only alleges "prior acts or enterprise-related activity" that are not elements of the charged crimes. Mem. Supp. Defs.' Mot. to Strike, Doc. No. 142, at 2. The defendants argue that, by "inject[ing]

prior acts into the case in the Indictment," the government is attempting to make "an end-run around the Court's obligation to rule on admissibility." *Id.* at 3.

Rule 7(d) motions are subject to an "exacting standard." *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990). "Motions to strike surplusage from an indictment will be granted only where the challenged allegations are 'not relevant to the crime charged and are inflammatory and prejudicial.'" *United States v. Hernandez*, 85 F.3d 1023, 1030 (2d Cir. 1996) (quoting *Scarpa*, 913 F.2d at 1013). "[I]f evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken." *Scarpa*, 913 F.2d at 1013. "[E]vidence of uncharged criminal activity is [generally admissible] . . . if it arose out of the same transaction or series of transactions as the charged offense, if it [is] inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime [on] trial." *United States v. Towne*, 870 F.2d 880, 886 (2d Cir. 1989). It is too early to tell whether that standard will be met in this case.

The defendants stand accused of robbing and murdering a drug dealer; paragraph two alleges that the defendants had a practice of robbing drug dealers in the Hartford area. The defendants' alleged prior robberies may have "ar[isen] out of the same transaction or series of transactions as the charged offense," or they may be "inextricably intertwined with the evidence regarding the charged offense." *Towne*, 870 F.2d at 886. Although I need not decide now whether evidence of the alleged prior robberies will be admissible at trial, the fact that it may be makes it inappropriate to strike the language from the indictment. *See United States v. Burke*, 2016 WL 5934693, at *3 (D. Conn. Oct. 12, 2016).

It is also very unlikely that the defendants will suffer any prejudice by the inclusion of paragraph two in the indictment. I generally do not provide the jury with a copy of the

indictment, and so the jurors will learn of the alleged prior acts only if I determine that evidence of those acts is admissible at trial. Therefore, I deny the joint motion to strike paragraph two from the indictment.

2. *Aliases*

The defendants also ask that I strike their alleged aliases from the indictment. "Use of aliases in the indictment is permissible '[i]f the Government intends to introduce evidence of an alias and the use of that alias is necessary to identify the defendant in connection with the acts charged in the indictment.'" *United States v. Peterson*, 168 F. Supp. 2d 51, 56 (E.D.N.Y. 2001) (quoting *United States v. Rodriguez*, 734 F. Supp. 116, 128 (S.D.N.Y. 1990), *aff'd*, 968 F.2d 130 (2d Cir. 1992)). In particular, when witnesses only know the defendants by their alleged aliases, "inclusion of the alias[es] in the indictment is proper." *Id.*

The government states that it will "call a number of witnesses who will testify that they knew the defendants only by their aliases," and that "without using the aliases, it will be impossible for th[o]se individuals to identify the defendants." Mem. Opp'n Mot. Dismiss, Doc. No. 154, at 17. Therefore, because the defendants' "alias[es] will comprise part of [the government's] proof at trial," I conclude that "inclusion of the alias[es] in the indictment is proper." *Peterson*, 168 F. Supp. 2d at 56; *see also Burke*, 2016 WL 5934693, at *4 ("[A]liases may be included in an indictment where evidence of those aliases will be presented to the jury at trial."). I also cannot conceive how inclusion of the aliases in the indictment would prejudice the defendants, because it is not my practice to give the jury a copy of the indictment. Thus, I deny the defendants' joint motion to strike the aliases.

My ruling is without prejudice to any motions in limine challenging the use of defendants' alleged aliases and evidence of their alleged prior acts. To the extent that I permit the

prosecution to use the defendants' aliases at trial, I will of course impose appropriate limitations

(and may give a curative instruction) to avoid prejudicing the defendants.[6]

C. Motions to Sever

Cook, Hunter, and Lee all move to sever trial from their codefendants. Federal Rule of

Criminal Procedure 14(a) provides:

> If the joinder of offenses or defendants in an indictment, an information,
> or a consolidation for trial appears to prejudice a defendant or the
> government, the court may order separate trials of counts, sever the
> defendants' trials, or provide any other relief that justice requires.

As the Supreme Court has observed, "[t]here is a preference in the federal system for

joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537

(1993). Such trials "promote efficiency and 'serve the interests of justice by avoiding the scandal

and inequity of inconsistent verdicts.'" *Id.* (quoting *Richardson v. Marsh*, 481 U.S. 200, 210

(1987)). Therefore, the Court has held, "a district court should grant a severance under Rule 14

only if there is a serious risk that a joint trial would compromise a specific trial right of one of

the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."

*Id.* at 539. "When the risk of prejudice is high, a district court is more likely to determine that

separate trials are necessary, but . . . less drastic measures, such as limiting instructions, often

will suffice to cure any risk of prejudice." *Id.*

---

[6] I intend to be particularly watchful of the defendants' use of Hunter's nickname, "Killer," which seems "strongly suggestive of a criminal disposition, and a propensity to commit particularly heinous crimes, including the very offenses charged in the indictment." *See United States v. Farmer*, 583 F.3d 131, 146 (2d Cir. 2009) (internal quotation marks omitted).

1. *Cook*

Cook offers two arguments in favor of severance. First, Cook suggests that a post-arrest statement made by Hunter implicates the doctrine of *Bruton v. United States*, 391 U.S. 123 (1968). *Bruton* involved two codefendants, Evans and Bruton, who were tried jointly for the same crime. Evans had confessed, naming and incriminating Bruton, but then recanted and proceeded to trial. At trial, the judge admitted the confession against Evans, while instructing the jury that it should not consider the confession against Bruton. The Supreme Court held that "despite the limiting instruction, the introduction of Evans' out-of-court confession at Bruton's trial had violated Bruton's right, protected by the Sixth Amendment, to cross-examine witnesses." *Gray v. Maryland*, 523 U.S. 185, 190 (1998) (discussing *Bruton*, 391 U.S. at 137). The Court acknowledged that "in many circumstances a limiting instruction will adequately protect one defendant from the prejudicial effects of the introduction at a joint trial of evidence intended for use only against a different defendant," but concluded that "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Id.* (quoting *Bruton*, 391 U.S. at 135). Such a context was presented by Evans' "powerfully incriminating extrajudicial statements," which were both "devastating to the defendant" and "inevitably suspect," and which could not "be tested by cross-examination" because Evans did not testify at trial. *Bruton*, 391 U.S. at 135–36.

*Bruton* is simply not applicable here. As Cook relates, when Hunter was asked after his arrest whether "he still s[aw] OINK [Cook] and BREEZE [Mickens]," he replied, "[T]hey're my boys." *See* Mot. Sever, Doc. No. 145, at 3. That hardly constitutes a "powerfully incriminating extrajudicial statement" of the sort made in *Bruton*, where Evans had "stated that both he (Evans) and Bruton together had committed" the charged crime. *See Gray*, 523 U.S. at 189 (discussing

*Bruton*, 391 U.S. at 124). Here, Hunter's statement did not confess to (or even mention) the crime and did not specifically implicate anyone. Thus, Cook's "dilemma . . . is considerably weaker than that which existed in *Bruton*." *Cf. United States v. Perez*, 299 F. Supp. 2d 38, 42 (D. Conn. 2004). "[E]ven if there were some risk of prejudice, here it is of the type that can be cured with proper instructions, and 'juries are presumed to follow their instructions.'" *Zafiro*, 506 U.S. at 540 (quoting *Richardson*, 481 U.S. at 211). Finally, the government represents that it does not intend to introduce Hunter's statement at trial. *See* Mem. Opp'n Mots. Sever, Doc. No. 153, at 6.

Cook also asserts that he will be "unduly prejudiced by a joint trial" because (a) the prosecution intends to offer DNA evidence implicating Mickens and Hunter—but not Cook—to the scene of Teasley's murder, and (b) "Hunter has signaled that he is prepared to serve as a second prosecutor against [ ] Cook, countering the weight of the evidence against him by asserting that another, such as [ ] Cook, was 'the shooter.'" Cook's Mot. Sever, Doc. No. 145, at 5. Those arguments fail to justify severance. "[D]iffering levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials." *United States v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003). Furthermore, "a fair trial does not include the right to exclude relevant and competent evidence," *Zafiro*, 506 U.S. at 540, and "the fact that testimony against a codefendant may be harmful is not a ground for severance if that testimony would also be admissible against the moving defendant tried separately." *United States v. Rosa*, 11 F.3d 315, 341 (2d Cir. 1993). Here, the prosecution presumably would attempt to establish the same connection among Cook, Mickens, and Hunter at a separate trial, and would offer the same DNA evidence to link Cook's alleged compatriots to the crime. The mere "disparity in the proof" provides no reason to sever. *See United States v. Carson*, 702 F.2d 351, 367 (2d Cir. 1983).

As for Cook's argument that Hunter will "serve as a second prosecutor," Cook's Mot. Sever, Doc. No. 145, at 5, "[t]he mere fact that codefendants seek to place the blame on each other is not the sort of antagonism that requires a severance." *United States v. Villegas*, 899 F.2d 1324, 1346 (2d Cir. 1990); *see United States v. Casamento*, 887 F.2d 1141, 1153 (2d Cir. 1989) ("Mere fingerpointing does not require severance.") (internal quotation marks omitted). "In order to make a showing of 'mutually antagonistic' or 'irreconcilable defenses,' the defendant must make a factual demonstration that acceptance of one party's defense would tend to preclude the acquittal of the other." *United States v. Salameh*, 152 F.3d 88, 116 (2d Cir. 1998) (internal quotation marks and brackets omitted). Although Cook indicates that Hunter will "assert[] that another [defendant], such as [ ] Cook, was 'the shooter,'" Cook's Mot. Sever, Doc. No. 145, at 5, he does not indicate that "accepting Hunter's defense 'requires that the jury must *of necessity* convict a second defendant,'" *United States v. Yousef*, 327 F.3d 56, 151 (2d Cir. 2003) (quoting *United States v. Cardascia*, 951 F.2d 474, 484 (2d Cir. 2003)) (emphasis in *Yousef*), particularly because the defendants are charged with jointly aiding and abetting in the killing. *See* Indictment, Doc. No. 1, at 4–5. In addition, "[m]utually antagonistic defenses are not prejudicial *per se*," and "Rule 14 does not require severance even if prejudice is shown." *Zafiro*, 506 U.S. at 538–39. Here, "limiting instructions . . . will suffice to cure any risk of prejudice" from Cook's and Hunter's potentially contradictory defenses. *Id.* at 539.

2. *Hunter*

Hunter also makes several arguments in favor of severance. He first contends that his trial should be severed because the evidence against him is stronger than that against his codefendants. The government's cooperating witness claims that Hunter owned a gun of the same caliber as the bullets that killed Teasley; Hunter was visually identified by Teasley's

fiancée (who brought Teasley's safe to his kidnappers); and "the most definitive DNA sample found at the scene is that of [ ] Hunter." Mem. Supp. Hunter's Mot. Sever, Doc. No. 136-1, at 8. Because "the majority of the non-testimonial evidence pertains to [ ] Hunter," Hunter asserts that "the other defendants would be best served by arguing that [ ] Hunter was in fact the person who murdered [ ] Teasley." *Id.* Thus, Hunter moves for a severance so that he is not forced to defend against cross-accusations by his codefendants.

Hunter acknowledges that the identity of the actual shooter carries less importance in this case, because the government's theory is that the defendants "were part of a joint venture and . . . assisted each other in the murder." *See id.* Thus, the other defendants could still be liable on an aiding and abetting theory even were they all to accuse Hunter of pulling the trigger. In nevertheless arguing for a severance, Hunter relies upon *United States v. Green*, 324 F. Supp. 2d 311 (D. Mass. 2004), a murder trial in which the court granted a severance because two defendants each argued that the other had shot the victim. Here, however—unlike in *Green*— there is evidence that there was more than one shooter, and the defendants are also charged with assisting one another in Teasley's kidnapping and robbery before he was murdered. *See* Mem. Opp'n Mots. Sever, Doc. No. 153, at 5 n.3. Thus, the jury could convict all the other defendants on theories of aiding and abetting or felony murder, even if the jurors believed that Hunter alone shot Teasley. *Cf. Aquart*, 2010 WL 3211074, at *6 ("[U]nlike in *Green*—in which ballistics evidence implied there was only one shooter, and each defendant was expected to testify that the other defendant was that shooter—in this case there could have been more than one murderer . . . . [and the second defendant] could still be convicted as a criminal participant.").

Hunter's second argument for severance concerns the same statement—"[T]hey're my boys"—that I addressed with respect to Cook's motion. Hunter suggests that Cook and Mickens

will attempt to discredit Hunter's statement by impeaching him through introduction of his prior convictions. Mem. Supp. Mot. Sever, Doc. No. 136-1, at 10. As indicated above, however, the government represents that it will not introduce the alleged statement at trial. *See* Mem. Opp'n Mots. Sever, Doc. No. 153, at 6. Hence, there is no reason to sever Hunter's trial on that basis.

### 3. *Lee*

Lee's motion to sever is more substantial. Lee moves to sever trial out of fear of "spillover" prejudice from the evidence that will be offered against his codefendants. "The 'typical spillover claim is that evidence admissible against only one defendant is prejudicial to all defendants' and that individual trials would avoid that prejudice." *Aquart*, 2010 WL 3211074, at *2 (quoting *United States v. DiNome*, 954 F.2d 839, 843 (2d Cir. 1992)). Thus, where "the sheer volume and magnitude of the evidence against one defendant so dwarfs the proof presented against his co-defendant[s]," the Second Circuit has indicated that "a severance is required to prevent unacceptable spillover prejudice." *United States v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003). Here, Lee argues the converse of the typical spillover claim: he asserts that evidence that might be admissible against all of his codefendants is prejudicial to him alone.

Specifically, Lee notes that there is no evidence that Lee participated in any of the prior acts (kidnappings and robberies) allegedly committed by his codefendants. According to Lee, evidence of those prior acts—which the government may seek to offer at trial under Federal Rule of Evidence 404(b)—"would be inadmissible at a trial against [ ] Lee alone," and its "cumulative effect would be incredibly prejudicial to [ ] Lee" at the joint trial. Mem. Supp. Mot. Sever, Doc. No. 147, at 5. The government responds that "the fact that Lee knew that the other defendants had committed a variety of other kidnappings and robberies is relevant to Lee's motive and intent when he . . . set up the kidnapping and robbery of Teasley," and that "a limiting instruction

could be given to the jury to ensure that the evidence is only admitted against those defendants who were involved in the prior bad acts." Mem. Opp'n Mot. Sever, Doc. No. 153, at 9–10.

"'Prejudice' occurs in joint trials when proof inadmissible against a defendant becomes a part of his trial solely due to the presence of co-defendants as to whom its admission is proper." *Salameh*, 152 F.3d at 115. When some defendants "are implicated by only bits and pieces of the evidence," the jury may be "subjected to weeks of trial dealing with dozens of incidents of criminal misconduct which do not involve those [minor] defendants in any way." *United States v. Gallo*, 668 F. Supp. 736, 750 (E.D.N.Y. 1987) (quoting *United States v. Branker*, 395 F.2d 881, 882 (2d Cir. 1968)) (first alteration omitted). Even though "juries are presumed to follow their instructions," *Zafiro*, 506 U.S. at 540, in extreme cases, "[t]he sheer volume of such evidence against coconspirators . . . can so unbalance the scales that 'no amount of cautionary instructions could . . . undo [ ] the harm.'" *Gallo*, 668 F. Supp. at 750 (quoting *United States v. Kelly*, 349 F.2d 720, 759 (2d Cir. 1965)).

I conclude that this is such an extreme case. According to the expected testimony of the government's cooperating witness, Lee's four codefendants were involved in seven or eight different kidnappings and robberies in the Hartford area. *See* Mem. Supp. Lee's Mot. Sever, Doc. No. 147, at 4. The government apparently intends to offer Rule 404(b) evidence with respect to at least one such prior act, the kidnapping, robbery, and shooting of Steven Keaton. *See id.* at 4–5. Lee is not alleged to have participated in the Keaton robbery or in any of the defendants' other prior acts. At trial, of course, I would instruct the jury not to consider those prior acts against Lee. Nevertheless, I fear there is a "serious risk" that the introduction of substantial amounts of Rule 404(b) evidence against the other defendants might "prevent the jury from making a reliable judgment about [Lee's] guilt or innocence." *Zafiro*, 506 U.S. at 539.

Furthermore, the "risk of prejudice is heightened" because of the defendants' "markedly different degrees of culpability." *Id.* Even under the government's theory of the case, Lee was less involved in the crime than the other defendants. Lee is not alleged to have been present when Teasley was kidnapped, robbed, and murdered; he merely is alleged to have set Teasley up by arranging the drug transaction and providing the details to the other defendants. To be sure, "differing levels of culpability and proof are inevitable in any multi-defendant trial," and would not justify a severance "standing alone." *See Carson*, 702 F.2d at 366–67. Nevertheless, when considered in conjunction with my concern about the Rule 404(b) evidence, I conclude that "the distinct and different roles the[] defendants are alleged to have played" further supports severing Lee's trial from that of his codefendants. *See Perez*, 299 F. Supp. 2d at 44.

For those reasons, I grant Lee's motion to sever trial from his codefendants, Doc. No. 146. I deny as moot his earlier motion to sever, Doc. No. 120.

D. <u>Motions to Suppress</u>

Mickens and Hunter move to suppress their post-arrest statements and silences. Mickens and Hunter both argue that they did not waive their rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and that their statements were not voluntarily obtained; Hunter also argues that his silence may not be introduced into evidence under *Doyle v. Ohio*, 426 U.S. 610 (1976).

When a person is taken into custody, "he must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 479. "The *Miranda* rule and its requirements are met if a suspect receives adequate *Miranda* warnings, understands them, and has an opportunity to invoke the rights before giving answers or

admissions." *Berghuis v. Thompkins*, 560 U.S. 370, 387 (2010). "The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly, and intelligently." *Miranda*, 384 U.S. at 444. Although the government "bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of [the] *Miranda* doctrine," the prosecution "need prove waiver only by a preponderance of the evidence." *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

In evaluating whether post-arrest statements were voluntarily made, the court looks at "the totality of the circumstances in which they were given to determine whether the government agents' conduct was such as to overbear [a defendant's] will to resist and bring about confessions not freely self-determined." *United States v. Kaba*, 999 F.2d 47, 51 (2d Cir. 1993) (internal quotation marks omitted). Factors a district court should consider include "the characteristics of the accused, such as his experience, background, education; the conditions of the interrogation; and the conduct of law enforcement officials." *Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir. 1997). "The voluntariness of a waiver . . . depend[s]," however, "on the absence of police overreaching, not on 'free choice' in any broader sense of the word." *Connelly*, 479 U.S. at 170.

1.  *Mickens*

On April 4, 2017, FBI special agents arrested Mickens in Bloomfield, Connecticut. The agents transported Mickens to the federal courthouse in Hartford and brought him to an interview room. FBI Special Agent Ryan James read aloud Mickens' *Miranda* rights. Mickens stated that he understood his rights and that he was willing to talk to investigators. Mickens also signed an 'Advice of Rights' form, which was witnessed by Detectives Andrew Jacobson and Joseph Fargnoli of the Hartford Police Department.

Special Agent James explained the nature of the charges against Mickens and their penalties, and summarized the events surrounding the kidnapping, robbery, and murder of Charles Teasley. Mickens denied knowing anyone by the name of "Charles Teasley" or "Man," and stated that he knew nothing about Teasley's murder. Mickens admitted to knowing codefendants Terrell Hunter and Douglas Lee.

Detective Jacobson showed Mickens a crime scene photograph of Teasley's vehicle. Mickens said that he did not recognize the vehicle. Special Agent James then showed Mickens a crime scene photograph of Teasley's face. Mickens stated that he did not recognize the person in the photograph. Special Agent James pointed out to Mickens that Teasley was wearing a jacket in the photograph, and asked why Mickens' DNA would be on the jacket if Mickens did not know Teasley. Mickens did not respond.

Mickens argues that his post-arrest statements should be suppressed because they were not voluntary. Specifically, Mickens asserts that "officers confronted [ ] Mickens with a graphic crime scene photograph, made clear to [ ] Mickens that he could be facing the death penalty— and then went on to ask him about other people who might alternatively be held culpable." Mem. Supp. Mickens' Mot. Suppress, Doc. No. 103, at 3. Mickens contends that "[t]his tactic, which emphasized the monstrous ramifications of silence while also suggesting a way out by implicating others along with himself, was sufficiently coercive to overbear the will of an ordinary reasonable person." *Id.* at 3–4. In addition, Mickens states that his condition at the time "was even more precarious than that of a typical person," because Mickens "suffers from epileptic seizures and requires medication to treat them," and that "[o]nly after obtaining a signed *Miranda* waiver form from [ ] Mickens did officers reach out to his mother to instruct her to bring medication to court." *Id.* at 4.

The government responds that "[t]here is no basis on which to grant . . . a motion [to suppress]," because "Mickens was read his *Miranda* rights and signed an Advice of Rights form." Mem. Opp'n Mickens' Mot. Suppress, Doc. No. 110, at 4. The government also argues that "[t]he credible evidence in the record demonstrates that Mickens' *Miranda* waiver was made voluntarily, knowingly, and intelligently." *Id.* at 6.

According to the uncontested facts, Special Agent James informed Mickens of his *Miranda* rights before the interview began. Mickens stated that he understood his *Miranda* rights. Mickens does not claim that the officers threatened him, promised him anything, or induced him to make any statements during his interview. Mickens states that the officers reached out to his mother to instruct her to bring his medication to court after he signed a Miranda waiver form. Mickens does not claim, however, that the officers conditioned access to his epilepsy medication upon his signing of the *Miranda* waiver or upon making any statements.

Mickens' medical condition of epilepsy did not prevent him from voluntarily, knowingly, and intelligently waiving his *Miranda* rights, or from being able to give any subsequent statements voluntarily. Mickens received his *Miranda* warnings prior to his interrogation and waived his rights voluntarily, knowingly, and intelligently. Mickens' responses to the officers' questions were given freely, without coercion or force. *Cf. Moran v. Burbine*, 475 U.S. 412, 421 (1986) ("[T]he record is devoid of any suggestion that police resorted to physical or psychological pressure to elicit the statements."). There is nothing in the record to indicate that Mickens' medical condition rendered the statements he made during his interview involuntary.

I conclude that the government has established by a preponderance of the evidence that the statements Mickens made were voluntary. Hence, I deny Mickens' motion to suppress.[7]

### 2. *Hunter*

On April 4, 2017, FBI special agents arrested Hunter at his place of employment in Hartford, Connecticut. Hunter was transported to the federal courthouse in Hartford by Special Agent James and Task Force Officer Jason Guerrera. During the ride to the courthouse, Special Agent James read Hunter his *Miranda* rights from the FBI's standard Advice of Rights form. Hunter stated that he understood his rights, but could not sign the Advice of Rights form because he was handcuffed. Special Agent James explained to Hunter that he was under arrest for the kidnapping, robbery, and murder of Charles Teasley. Hunter responded that "he did not know anything about that." Special Agent James summarized the events of the Teasley kidnapping and murder, to which Hunter made no response.

Upon arrival at the courthouse, Special Agent James, Detective Jacobson, and Detective Fargnoli escorted Hunter to an interview room. The officers told Hunter that "Oink" (Harold Cook) and "Breeze" (Gerund Mickens) also had been charged with Teasley's kidnapping and murder. Hunter did not respond. Special Agent James asked Hunter whether he still saw "Oink" and "Breeze." Hunter replied, "[T]hey're my boys." Detective Jacobson asked Hunter whether he knew anyone named Charles Teasley or "Man." Hunter said, "No."

---

[7] Mickens also requests an evidentiary hearing on his motion. "'An evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, detailed, and nonconjectural to enable the court to conclude that contested issues of fact . . . are in question.'" *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992). A defendant seeking a hearing must submit an affidavit alleging "personal knowledge" of the relevant facts. *United States v. Gilette*, 383 F.2d 843, 848 (2d Cir. 1967). In the present case, Mickens has not identified any "definite, detailed, and nonconjectural" contested issues of fact. *Pena*, 961 F.2d at 339. Therefore, I conclude that an evidentiary hearing is unnecessary.

Hunter argues that "his post-arrest statements should . . . be suppressed because he did not waive his right to remain silent," Mem. Supp. Hunter's Mot. Suppress, Doc. No. 130-1, at 2; because even if he did, his statements were "involuntary," *id.*; "because he did not waive his Sixth Amendment right to counsel," *id.*; and "because his silence in response to questioning is inadmissible" under *Doyle v. Ohio*, 426 U.S. 610 (1976). Mem. Supp. Hunter's Mot. Suppress, Doc. No. 130-1, at 2. The government responds that Hunter waived his rights by stating that he understood his rights after being read them and making "uncoerced response without invoking his right to remain silent or requesting counsel." Mem. Opp'n Hunter's Mot. Suppress, Doc. No. 152, at 4. The government also represents that it does not seek to introduce any of Hunter's post-arrest silences at trial. *See id.* at 3.

To invoke both the right to remain silent and the right to counsel, the defendant must "do so 'unambiguously.'" *Berghuis*, 560 U.S. at 381 (quoting *Davis v. United States*, 512 U.S. 452, 459 (1994)). "[P]olice are not required to end the interrogation" if the defendant "makes a statement concerning the right to counsel 'that is ambiguous or equivocal,'" or if the defendant fails to "say that he want[s] to remain silent or that he d[oes] not want to talk with the police." *Id.* at 381–82 (quoting *Davis*, 512 U.S. at 459). It appears uncontested that Hunter did not invoke either his right to counsel or his right to remain silent.

"Even absent the accused's invocation of the right to remain silent" or the right to counsel, "the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived *Miranda* rights' when making the statement." *Id.* at 382 (brackets omitted). The "waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full awareness of both the nature of the

right being abandoned and the consequences of the decision to abandon it.'" *Id.* at 382–83

(quoting *Burbine*, 475 U.S. at 421). "Where the prosecution shows that a *Miranda* warning was

given and that it was understood by the accused, an accused's uncoerced statement establishes an

implied waiver of the right to remain silent." *Id.* at 384.

Here, Hunter does not contest that he was read his *Miranda* rights and responded that he

understood those rights. Mem. Supp. Hunter's Mot. Suppress, Doc. No. 130-1, at 3–4. Nor does

he claim that he was coerced. *See Davis*, 512 U.S. at 460 ("[F]ull comprehension of the rights to

remain silent and request an attorney is sufficient to dispel whatever coercion is inherent in the

interrogation process.") (brackets omitted). Instead, the record clearly shows that Hunter, fully

understanding his rights, "knowingly and voluntarily made a statement to police" and failed to

"umambiguously request counsel." *Berghuis*, 560 U.S. at 387; *Davis*, 512 U.S. at 459. Therefore,

I conclude that Hunter "waived his right[s]" under *Miranda*.

The government has shown by a preponderance of the evidence that Hunter waived his

right to remain silent and his right to counsel when he spoke to the police after his arrest.

Therefore, I deny Hunter's motion to suppress his post-arrest statements.[8]

## III.  Conclusion

For the foregoing reasons, I deny the defendants' motions to dismiss the indictment,

Docs. Nos. 137, 139, 143, & 148; the motions to suppress evidence, Doc. No. 102 & 130; and

the joint motion to strike surplusage from the indictment, Doc. No. 141. I also deny the motions

to sever trial filed by Harold Cook, Doc. No. 145, and Terrell Hunter, Docs. Nos. 136 & 151. I

---

[8] Hunter does not appear to request an evidentiary hearing. If he had, I would have denied the
request for the reasons discussed with respect to Mickens' motion. *See supra* note 7.

grant the second motion to sever trial filed by Douglas Lee, Doc. No. 146, and deny as moot the

first such motion, Doc. No. 120.


    So ordered.

    Dated at Bridgeport, Connecticut, this 21st day of May 2018.

                                            /s/ STEFAN R. UNDERHILL
                                            Stefan R. Underhill
                                            United States District Judge