# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

UNITED STATES

v.

HAROLD COOK,
GERUND MICKENS, and
TERRELL HUNTER

No. 3:17-cr-65 (SRU)

## RULING ON MOTIONS FOR JUDGMENTS OF ACQUITTAL AND/OR FOR A NEW TRIAL

Harold Cook ("Oink"), Gerund Mickens ("Breeze"), and Terrell Hunter ("Rell") were charged with the kidnapping of Charles Teasley ("Man"), resulting in Teasley's death, in violation of 18 U.S.C. § 1201(a)(1) and 18 U.S.C. § 2 (count one); the firearm-related murder of Teasley in furtherance of kidnapping, in violation of 18 U.S.C. § 924(j)(1) and 18 U.S.C. § 2 (count two); and the firearm-related murder of Teasley in furtherance of Hobbs Act Robbery, in violation of 18 U.S.C. § 924(j)(1) and 18 U.S.C. § 2 (count three).[1] *See* Indictment, Doc. No. 1. The jury found Cook, Mickens, and Hunter guilty on all three counts. *See* Verdict, Doc. No. 320. Subsequently, count two was dismissed on consent. *See* Mot. to Dism., Doc. No. 462; Order, Doc. No. 464. Cook, Mickens, and Hunter now seek judgments of acquittal on counts one and three or, in the alternative, a new trial. *See* Hunter Mot. for J. of Acquittal or New Trial ("Hunter Mot."), Doc. No. 330; Cook Mot. for J. of Acquittal or New Trial ("Cook Mot."), Doc.

---

[1] Douglas Lee ("Fly") and Jesus Ashanti ("Black") were also charged in all three counts of the Indictment. *See* Indictment, Doc. No. 1. Ashanti plead guilty and testified for the government. On May 21, 2018, I granted Lee's Motion to Sever his trial from that of his co-defendants. *See* Order on Mot. to Sever, Doc. No. 178 at 20-22. He was subsequently tried and found guilty of count one and acquitted of counts two and three. *See* Lee Verdict, Doc. No. 392. On September 6, 2019, I granted Lee's Motion for Judgment of Acquittal because the evidence did not sufficiently show that Lee knew that Teasley would be kidnapped, as opposed to merely robbed. *See* Order on Mot. J. of Acquittal, Doc. No. 484.

No. 332; Mickens Mot. for J. of Acquittal or New Trial ("Mickens Mot."), Doc. No. 333. For the following reasons, the defendants' motions are **denied**.

## I.    Background

The following general factual evidence was alleged by the government and introduced at trial. Additional facts will be set out below. On the night of January 9, 2009, Teasley received a phone call from Lee, and the two set up a drug transaction where Teasley would buy cocaine from Lee. Tr. 8/9/18, Doc. No. 402 at 650-51. At around 9:00 p.m., Teasley took $1,100 from his girlfriend Kim Brookens' purse and left the home he and Brookens shared in West Hartford. *Id*. at 651-54. Teasley left in his mother's car, an Acura TL, and was planning to bring his grandmother to work and meet Lee for the transaction. *Id*. at 654-55. Shortly after he left the house, Brookens received a call from Teasley, who asked her to bring his small safe—where he kept money and drugs—downstairs. *Id*. at 658-59. Brookens retrieved the safe and gave it to a man, not Teasley, standing at the front door, whom she described as a tall, thin, dark-skinned black man wearing all black and a black face mask. *Id*. at 660-64. While doing so, she saw the Acura TL parked on the street in front of her house. *Id*. at 667. Thereafter, Teasley did not pick up his grandmother from work, nor did he answer Brookens' multiple phone calls. *Id*. at 686-88.

Brookens called Teasley's friends and relatives in search of him, and on January 10, 2009 reported Teasley missing to the West Hartford Police Department. *Id*. at 688-92. Teasley's body was found by his friend Desmond Wright two days later, on January 12, in the back seat of the Acura TL, parked on Colebrook Street in Hartford. *See* Tr. 8/7/18, Doc. No. 400 at 76, 104-05, 137-38. Teasley's hands were bound behind his back with zip ties and he had been shot multiple times in the head. *See id*. at 190-91, 206; Tr. 8/9/18, Doc. No. 402 at 635; *see also* Gov. Ex. 2, 5K, 5U, 6B, 6I.

In 2011, Ashanti, who was incarcerated for an unrelated crime, met with law enforcement and, as will be discussed more fully below, implicated himself, Cook, Mickens, Hunter, and Lee (among others) in Teasley's murder. Tr. 8/9/18, Doc. No. 402 at 773-74, 865. On March 30, 2017, Cook, Mickens, Hunter, Lee, and Ashanti were charged in a three-count indictment with Teasley's kidnapping robbery, and murder. *See* Indictment, Doc. No. 1. The government alleged in the indictment that Lee set up a drug deal with Teasley and when Teasley arrived at the specified location, he was ambushed by Cook, Mickens, Hunter, and Ashanti, who kidnapped Teasley by binding his hands and forcing him into the back of his car. *Id.* Cook, Mickens, Hunter, and Ashanti then assaulted Teasley, forced him to get the safe from Brookens, and murdered Teasley by shooting him in the head at close range. *Id.* As mentioned, Cook, Mickens, and Hunter were found guilty on all three counts and seek judgments of acquittal and/or a new trial.

## II.     Motions for Judgment of Acquittal

### A.  Standard

Pursuant to Rule 29 of the Federal Rules of Criminal Procedure, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29. "A defendant seeking to overturn a conviction on the ground that the evidence was insufficient bears a heavy burden." *United States v. Best*, 219 F.3d 192, 200 (2d Cir. 2000), *cert. denied*, 121 S. Ct. 1733 (2001). The reviewing court must view the evidence in the light most favorable to the prosecution and must reject the sufficiency challenge if it concludes that "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also United States v. Payton*, 159 F.3d 49, 56 (2d Cir. 1998)

("The ultimate question is not whether [the court believes] the evidence adduced at trial established defendant's guilt beyond a reasonable doubt, but whether *any rational trier of fact could so find*") (emphasis in original). A reviewing court must consider the evidence as a whole, not in isolation. *Best*, 219 F.3d at 200; *see also United States v. Memoli*, 2015 WL 1525864, at *2 (D. Conn. Apr. 2, 2015) ("In order to prevail on a Rule 29 Motion, Defendant must establish that the *totality* of the evidence is insufficient to convict him—it is irrelevant that one piece of evidence, standing alone, would not have been enough.") (emphasis in original). The "pieces of evidence must be viewed 'not in isolation, but in conjunction.'" *Memoli*, 2015 WL 1525864, at *2 (quoting *United States v. Casamento*, 887 F.2d 1141, 1156 (2d Cir. 1989)).

Further, the court must defer to the jury's determination of the weight of the evidence, credibility of witnesses, and competing inferences that can be drawn from the evidence. *Best*, 219 F.3d at 200. The district court must "assum[e] that the jury resolved all questions of witness credibility and competing inferences in favor of the prosecution." *United States v. Abu–Jihaad*, 630 F.3d 102, 134 (2d Cir. 2010) (internal citations omitted); *see also United States v. Morrison*, 153 F.3d 34, 49 (2d Cir. 1998) ("We defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of competing inferences that can be drawn from the evidence."). The jury is "exclusively responsible" for determinations of witness credibility, *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993), and the court must be "careful to avoid usurping the role of the jury since Rule 29 does not provide the trial court with an opportunity to substitute its determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005) (internal quotation marks omitted). The court should defer to the jury's credibility assessments and intrude upon that function only where "exceptional circumstances can be

demonstrated" such as when "testimony is patently incredible or defies physical realities." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992).

B. Discussion

The defendants argue[2] that they are entitled to judgments of acquittal on both counts of conviction because the government's case relied almost exclusively on Ashanti's testimony, which was incredible on its face and defied physical realities. *See* Mem. in Supp. Hunter Mot., Doc. No. 441; Mem. in Supp. Cook Mot., Doc. No. 445; Mem. in Supp. Mickens Mot., Doc. No. 290. With respect to count three specifically, the defendants argue further that the government failed to prove the interstate nexus of Hobbs Act Robbery. Mem. in Supp. Mickens Mot., Doc. No. 290 at 3. For the following reasons, the defendants' motions for judgment of acquittal are **denied**.

1. *Ashanti's Testimony*

The Second Circuit has held that "the testimony of a single accomplice witness is sufficient to sustain a conviction, provided it is not incredible on its face … or does not def[y] physical realities." *United States v. Truman*, 688 F.3d 129, 139 (2d Cir. 2012). A motion for judgment of acquittal "does not provide the trial court with an opportunity to substitute its own determination of … the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (internal quotation marks omitted). "It is the province of the jury and not of the court to determine whether a witness who may have been inaccurate, contradictory, and even untruthful in some respects was

---

[2] Each defendant does not raise every argument in his motion, but the defendants all join in the arguments of their co-defendants. *See* Mem. in Supp. Cook Mot., Doc. No. 445 at 51; Mem. in Supp. Hunter Mot., Doc. No. 441 at 16, Doc. No. 442 at 20; Mem. in Supp. Mickens Mot., Doc. No. 443 at 3.

nonetheless entirely credible in the essentials of his testimony." *United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011) (internal quotation marks omitted). Further, a witness' credibility should be challenged in "cross-examination and in subsequent argument to the jury … not in a motion for a judgment of acquittal." *Truman*, 688 F.3d at 139-40 (internal quotation marks omitted).

At trial, Ashanti testified as follows. He met Mickens in 1997 and the two became close friends in 2006. Tr. 8/9/18, Doc. No. 402 at 767. Through Mickens, Ashanti became friends with Cook, Mickens' brother. *Id*. at 767. Ashanti, Mickens, Cook, Hunter, and a man named Cinque Sutherland frequently hung out together at the "gambling house" on Enfield Street in the north end of Hartford. *Id*. at 768-69. That group would all "commit[] crimes together" at the direction of Cook. *Id*. at 769. Cook called Ashanti on the night of January 9, 2009 and told Ashanti to "come to the block," Enfield Street, so Cook, Ashanti, Mickens, and Hunter could commit a robbery of Troy Hicks. *Id*. at 774-76, 780. When Ashanti arrived, Cook had a handgun, though Ashanti did not know what kind, and Hunter made a call to acquire more guns for the rest of the group. *Id*. at 777-79. Ashanti drove the four of them to Oakland Terrace in Hartford and they retrieved three more handguns from someone named "Fats." *Id*. at 778-80. Ashanti was given a 9-millimeter, Mickens a Desert Eagle, and Hunter a .380 caliber. *Id*. at 828. After Cook and Hunter received phone calls, the nature of which Ashanti did not know, the group called off the robbery of Hicks. *Id*. at 784.

After the Hicks robbery was abandoned, Cook received a call and told Ashanti that they "'got another one'" and that Teasley had sold his BMW, had $40,000, and was looking to buy drugs. Tr. 8/9/18, Doc. No. 402 at 785-86. At Cook's direction, Ashanti pulled over on a side street and then Lee pulled up in his car. *Id*. at 786-87. Cook got out of Ashanti's car to talk to

Lee and when Cook returned he told Ashanti to drive to Lee's house. *Id*. at 788-89. When they arrived at Lee's house, Lee was on the porch of the house, but he left before Teasley arrived. *Id*. at 790, 800. Cook, Ashanti, Mickens, and Hunter went into the driveway to wait for Teasley, Ashanti and Mickens in the back, and Cook and Hunter in the front. *Id*. at 797. Teasley then walked up the driveway, Cook and Hunter grabbed him, and Teasley put his hands up and threw down "a knot" of money, which was a "small amount." *Id*. at 797, 803. At that point, one of the three men, Ashanti did not know who, zip tied Teasley's hands behind his back. *Id*. at 797, 800. Cook, Ashanti, Mickens, and Hunter then walked Teasley across the street and the five men got into the Acura TL, Teasley's car. *Id*. at 801.

After driving the car for a few minutes, Cook pulled over and asked Teasley for more money. Tr. 8/9/18, Doc. No. 402 at 802-03. When Teasley said he did not have any more, Cook pulled out a pocket knife and "started just poking [Teasley] in the top of his head." *Id*. at 804. Teasley continued to tell Cook that he did not have any more money than what he gave them in the driveway and Mickens "took the clip out of his gun and pulled it back so a bullet could fall out [and] … started smacking [Teasley] in his head, asking him where the money was." *Id*. at 805-06. Cook then drove Teasley's car back to the area of Lee's house, and Ashanti and Mickens got out of Teasley's car and got into Ashanti's car. *Id*. at 808. Ashanti followed Cook, who was still driving Teasley's car, to West Hartford. *Id*. at 809. Cook pulled Teasley's car over and walked back to Ashanti's car where he told them that Teasley had $25,000 that Mickens needed to go get it. *Id*. at 809-11. Mickens then got out of Ashanti's car, walked up to a house where he participated in "a little handoff" at the door, and then got into the car Cook was driving. *Id*. at 812.

Cook then drove off in Teasley's car and Ashanti, now alone in his car, followed.  Tr. 8/9/18, Doc. No. 402 at 812-13.  While Ashanti was following the car Cook was driving, he saw two flashes that he believed to be gunshots and then Cook pulled Teasley's car onto Colebrook Street.  *Id*. at 814.  When Ashanti pulled on the street, Cook, who was carrying a small safe, Mickens, and Hunter were already walking away from Teasley's car.  *Id*. at 815-16.  The three men got into Ashanti's car and Ashanti drove away without seeing inside Teasley's car.  *Id*. at 815-16.  Ashanti drove Hunter to his car and then followed Hunter to a house on Mahl Avenue in Hartford and parked in the driveway next to Hunter.  *Id*. at 816-18.  Ashanti tried to leave his car but Cook "put his hand on [Ashanti's] door to stop [him] from getting out."  *Id*. at 818. Although he was inside the car, Ashanti heard Hunter say the following to Cook: "'You see how Home, he was bluffing after you hit him. . . .  You see how Home is leaning over there bluffing so I hit him too. . . .  At first he was bluffing after you hit him.  Then I hit him, then I hit him because he was acting like he was bluffing.  That's when he leaned over.'"  *Id*. at 818-19. Ashanti understood Hunter to mean that Hunter and Cook both shot Teasley.  *Id*. at 819.  Cook told Ashanti there was nothing in the safe and Ashanti gave Cook his gun and left.  *Id*. at 820, 827-29.  Ashanti learned the next day that Teasley had been killed.  *Id*. at 831.

In December 2010, Ashanti was arrested in Massachusetts for bank robbery.[3]  Tr. 8/9/18, Doc. No. 402 at 832-34, 876.  While he was being held at the police station, Ashanti asked to meet with Hartford police and the FBI because he had information about the Teasley murder.  *Id*.

---

[3] Ashanti first testified that he was arrested on December 31, 2009 (*see* Tr. 8/9/18, Doc. No. 402 at 832-34), but he later testified that he was arrested on December 31, 2010.  *See id*. at 836-39, 865; Tr. 8/13/18, Doc. No. 403 at 921. It seems clear from his testimony that it was in fact 2010.  Tr. 8/9/18, Doc. No. 402 at 876 (Ashanti testifying that he signed the proffer agreement on March 17, 2011, just "months after [his] arrest for the bank robbery"); *see also* Gov. Ex. 55 (proffer agreement); Tr. 8/13/18, Doc. No. 403 at 910 (Ashanti clarifying that he was arrested in December 2010 because he signed the agreement months after his arrest).  Further, Ashanti testified that, while he was being held at the Massachusetts police station on the bank robbery, he asked to meet with Hartford police about the murder and he then met with police on January 7, 2011.  Tr. 8/9/18, Doc. No. 402 at 836-39, 865.  It seems unlikely that it would have taken roughly one year from his arrest, rather than a week, for the police to meet with Ashanti.

at 836-37. Ashanti met with law enforcement on January 7, 2011 and implicated himself, Cook, Mickens, Hunter, and Lee in Teasley's murder. *See id.* at 856-59, 865-71; *see also* Gov. Ex. 59 (identifying Cook); Gov. Ex. 60 (Ashanti identifying Hunter); Gov. Ex. 61 (Ashanti identifying Lee); and Gov. Ex. 62 (Ashanti identifying Mickens). Ashanti also told law enforcement that Sutherland was involved in the murder. Tr. 8/9/18, Doc. No. 402 at 788, 839, 865; Gov. Ex. 63 (Ashanti identifying Sutherland). He told police that Sutherland was with Lee when Lee came to meet Cook and, further, implicated Sutherland as one of the shooters. Tr. 8/9/18, Doc. No. 402 at 788, 840.

Ashanti met with the FBI on January 21, 2011. Tr. 8/13/18, Doc. No. 403 at 978-79. Thereafter, he was appointed lawyers and met with the government on March 17, 2011 and signed a proffer agreement. Tr. 8/9/18, Doc. No. 402 at 880; Gov. Ex. 55; Tr. 8/13/18, Doc. No. 403 at 979-81. At that time, he was still implicating Sutherland as part of the murder. Tr. 8/9/18, Doc. No. 402 at 880; Tr. 8/13/18, Doc. No. 403 at 911. The proffer agreement provided that the government could void the agreement if Ashanti intentionally provided false information. Tr. 8/13/18, Doc. No. 403 at 912; Gov. Ex. 55. Prompted by that language, and his attorneys' insistence that he be truthful, Ashanti met with the government again on April 25, 2011 and recanted his statements that Sutherland was involved in Teasley's murder. Tr. 8/13/18, Doc. No. 403 at 913-15; 979-81, 997, 1004. He did not recant any statements about Cook, Mickens, Hunter, or Lee. *Id.* at 915. "None of" Ashanti's statements about Sutherland's involvement was true, and he implicated Sutherland in the murder because the two had committed crimes together in the past and Ashanti felt that Sutherland was a threat to Ashanti's family if he was not incarcerated. Tr. 8/9/18, Doc. No. 402 at 788, 839-41; Tr. 8/13/18, Doc. No. 403 at 915-16.

Ashanti had little interaction with law enforcement regarding his cooperation until August 2015 when he was moved to Wyatt Detention Facility and met with the government. Tr. 8/13/18, Doc. No. 403 at 1016-18, 1020-21. Ashanti met with the government again on October 29, 2015 and June 7, 2016. *Id*. at 1022-23. Ashanti was indicted in March 2017 along with Cook, Mickens, Hunter, and Lee. *Id*. at 1024; *see* Indictment, Doc. No. 1. Ashanti met again with the government on April 13, 2018, February 5, 2018, and May 15, 2018. Tr. 8/13/18, Doc. No. 403 at 1025. On July 16, 2018, Ashanti signed a cooperation agreement and plea agreement with the government and pled guilty to the three counts. Gov. Ex. 54, 56; Tr. 8/13/18, Doc. No. 403 at 924-28, 1025.

The defendants strenuously cross-examined Ashanti about his credibility and general truthfulness. More specifically, defense counsel highlighted the many discrepancies between Ashanti's testimony at trial and various statements he made to law enforcement about the Teasley murder, beyond falsely implicating Sutherland. *See* Tr. 8/13/18, Doc. No. 403 at 1033 (Ashanti testified that on the night of the murder he was wearing a burgundy coat with white, green, and orange lettering, but he told law enforcement in 2015 that he was wearing a "light-colored jacket" that night); *id*. at 1034 (Ashanti testified that when he arrived at Enfield Street, Cook already had a gun, but in 2011 he told law enforcement it was Hunter who already had a gun); *id*. at 1034-36 (Ashanti testified Hunter got three guns for them to use, but in 2011 and 2015 he said Hunter only got two); *id.* at 1036-37 (Ashanti testified that he drove everyone to Lee's house, but in 2011 he said Hunter was driving); *id*. at 1040-41 (Ashanti testified that Hunter gave everyone gloves and masks, but in 2015 he said Mickens had the masks and Cook had the gloves); *id.* at 1041 (Ashanti testified that all the gloves were black, but in 2011 he said that Hunter had burgundy gloves); *id*. at 1041-42 (Ashanti testified that he did not know where

Lee went when he and the others arrived at the house that night, but in 2015 he said Lee walked away from the house and in 2018 he said Lee walked into the house); *id*. at 1044-45 (Ashanti testified Cook and Hunter grabbed Teasley when he arrived, but in 2011 he said it was Cook and Mickens); *id*. at 1045-46 (Ashanti testified that he could not remember if Teasley was taken to the ground when he arrived, but in 2011 he said Cook pushed Teasley down, and in 2015 he said all four of them took Teasley to the ground); *id*. at 1071-72 (Ashanti testified he did not know who put the zip ties on Teasley, but said in 2011 that it was Hunter and Mickens); *id*. at 1049-50 (Ashanti told law enforcement in 2011 that Cook and Mickens "tortured" Teasley, including carving Teasley's eye out, but he did not testify to that); *id*. at 1053-45 (Ashanti testified that he did not see into Teasley's car after it was abandoned, but said in 2011 that Teasley was left in a fetal position); *id*. at 1055-56 (Ashanti testified that Hunter couldn't bury the guns because the ground was too cold, but in 2011 and 2015 he said that Hunter had buried the guns); *see also* Tr. 3/14/18, Doc. No. 404 at 1339-41 (Special Agent William Aldenberg testifying about the inconsistencies in Ashanti's statements to law enforcement).

In an effort to discount Ashanti's testimony even further, defense counsel elicited testimony from Ashanti about other times he had been untruthful. Tr. 8/13/18, Doc. No. 403 at 940-41 (Ashanti testifying that in 2005 he falsely identified two women as his sisters so that they could visit him while he was incarcerated); *id.* at 942-43, 1018-20 (Ashanti testifying that at various times throughout his interaction with the criminal justice system, he gave inconsistent statements regarding how far he went in school before dropping out, his drug and alcohol use, his gang affiliation, his medication usage, and his suicide attempts); *id*. at 949-51, 957-58 (Ashanti testifying that he had used different names and dates of birth over the years, including giving a false name and date of birth to a police officer when he was pulled over and arrested in 2007).

Notably, Ashanti admitted that he "told a lot of lies" throughout his life to help himself when he was in trouble. *Id*. at 1070. Further, defense counsel elicited testimony about Ashanti's prior convictions including a ten-year prison sentence for a drive-by shooting, various assaults of other inmates while incarcerated, narcotics charges, violations of probation, and the Massachusetts bank robberies for which he was incarcerated at the time of his testimony. *Id*. at 944-53, 963-64, 969-71, 973-74, 1010. Ashanti also testified about his work as a paid informant for the Hartford police beginning in 2008. *Id*. at 960-69, 1060-66.

Many of the key aspects of Ashanti's testimony, with which the defendants take issue, were corroborated through other evidence, however. For instance, the ballistics examiner, James Stephenson, testified that the bullets recovered from the scene were fired from a .380 caliber handgun, which was consistent with Ashanti's testimony that Hunter was one of the shooters. Tr. 8/13/18, Doc. No. 403 at 1153-54. Further, the medical examiner, Frank Evangelista, testified that his examination of Teasley's body revealed that there was soot on his skin but not stippling, which suggests that he was shot from at most a foot away, which is consistent with Ashanti's testimony that Teasley was shot while in the car. Tr. 8/8/18, Doc. No. 401 at 119. Ashanti testified that Cook and Mickens "poked" and hit Teasley in the head while in his car, though there no stab wounds or contusions were found on Teasley's head. *Id*. at 64-65, 132. Dr. Evangelista testified, though, that it was "possible" that Teasley was hit in the face before being shot. *Id*. at 144. Further, he testified that he was unsure what type of bruising would occur if Teasley was wearing clothing where he was hit. *Id*. at 144-45. When Teasley's body was found, his hood was at least partially covering his head. *See* Gov. Ex. 5W (showing the position of Teasley's sweatshirt); Tr. 8/7/18, Doc. No. 400 at 199 (Detective Baez testifying that the hood was in the same position in exhibit 5W as it was when Teasley's body was found).

Further, Ashanti testified that Mickens sometimes spoke with a Jamaican accent to hide his voice, which is consistent with his testimony that Mickens retrieved the safe from Brookens and consistent with Brookens' testimony that the person who came to the door to retrieve the safe spoke with a Jamaican accent.[4]  Tr. 8/9/18, Doc. No. 402 at 720; Tr. 8/13/18, Doc. No. 403 at 923-24.  Ashanti, Hunter, and Mickens could not be eliminated as contributors to DNA found at the scene, which is consistent with Ashanti's testimony that they were there that night.  Tr. 8/8/18, Doc. No. 401 at 225, 238-39, 243-44.  The government also introduced cell phone evidence that corroborated Ashanti's version of events.  *See* Gov. Ex. 83 (showing the timing of calls made to and from Cook, Lee, and Teasley); Gov. Ex. 91 (presentation showing the general route of the phones during cell activity based on the towers used).  Ashanti also testified that "[o]nce [he] admitted to [Sutherland] not being there, [he] told [law enforcement] exactly what happened."  Tr. 8/13/18, Doc. No. 403 at 1073.  Ashanti testified that he didn't remember "every specific detail" about the night of January 9, 2009, but that he remembered "a lot" of what happened.  *Id*. at 1075.

Accordingly, Ashanti's testimony was not "incredible on its face" and did not "def[y] physical realities."  *Truman*, 688 F.3d at 139.  Further, Ashanti's criminal background, the inconsistencies in his testimony, and his admitted lying at some points do not render his testimony incredible as a matter of law, but are "factors relevant to the weigh the jury should accord to the evidence."  *United States v. Coté*, 544 F.3d 88, 100 (2d Cir. 2008).  The jury was entitled to take all of Ashanti's testimony into consideration when determining whether to find him credible.  It is the jury's role, and not mine, to determine a witness' credibility.  The jury

---

[4] As mentioned, Brookens told the police that the person who came to her door to retrieve the safe was a tall, thin, dark-skinned black man wearing a black face mask.  Tr. 8/9/18, Doc. No. 402 at 660-64.  On April 6, 2009, Brookens reviewed a photo array and identified Hunter as someone who "look[ed] similar to the person [she] handed the safe to."  *Id*. at 670-78; *see also* Gov. Ex. 43.

was entitled to determine whether it found Ashanti's testimony credible and, in so finding, was entitled to rely on it to find the defendants guilty. *O'Connor*, 650 F.3d at 855. The defendants' motions for judgment of acquittal on the basis of Ashanti's testimony are **denied**.

2. *Hobbs Act Robbery*

The defendants were found guilty in count three of the firearm-related murder of Teasley in the course of committing Hobbs Act Robbery pursuant to 18 U.S.C. § 1915, which provides, in relevant part, that a person commits Hobbs Act Robbery when he:

> in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery … or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to [commit robbery].

18 U.S.C. § 1915(a); *see also* Indictment, Doc. No. 1. "Robbery" is defined as "the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force[.]" 18 U.S.C. § 1915(b)(1). The defendants argue that the government failed to prove the interstate nexus element of Hobbs Act Robbery and, therefore, they are entitled to judgments of acquittal on count three. The government argues that it established that the defendants targeted Teasley for his drugs and/or drug proceeds and, therefore, the interstate nexus requirement was satisfied.

The Hobbs Act "reaches any obstruction, delay, or other effect on commerce, even if small, and the Act's definition of commerce encompasses 'all … commerce over which the United States has jurisdiction.'" *Taylor v. United States*, 136 S. Ct. 2074, 2079 (2016) (quoting 18 U.S.C. § 1915(b)(3)). "[T]o satisfy the Act's commerce element, it is enough that a defendant knowingly stole or attempted to steal drugs or drug proceeds" because "the market for illegal drugs is commerce of which the United States has jurisdiction." *Id*. at 2081 (internal quotation marks omitted). "In order to obtain a conviction under the Hobbs Act for the robbery or

attempted robbery of a drug dealer, the Government need not show that the drugs that a defendant stole or attempted to steal either traveled or were destined for transport across state lines." *Id*. The Hobbs Act is "unmistakably broad" and must be read as such. *Id.* at 2079; *see also United States v. Culbert*, 435 U.S. 371, 373 (1978) (the interstate element of the Hobbs Act "do[es] not lend [itself] to restrictive interpretation"); *Stirone v. United States*, 361 U.S. 212, 215 (1960) (the Hobbs Act "speaks in broad language").

There was evidence in the record that Teasley was a drug dealer and committed robberies. *See* Tr. 8/9/18, Doc. No. 402 at 634-35 (Brookens testifying that Teasley dealt mostly crack cocaine); *id*. at 634-35, 646-47 (Brookens testifying that a few months before he was killed, Teasley and Desmond Wright robbed other drug dealers, to whom everyone referred as "the Jamaicans," of a substantial amount—three duffel bags full—of marijuana, and roughly $100,000). Importantly, the uncontroverted evidence was that Teasley was going to meet Lee to participate in a drug transaction and brought with him at least $1,100 which he was going to use to purchase drugs. Before the transaction took place, however, Teasley was ambushed by the defendants, who took the $1,100. That money was intended to be drug proceeds and, but for the defendants' interruption of the drug deal, would have been. Simply put, the defendants robbed a known drug dealer of money that they knew was intended to be used for purchasing drugs. In light of the broad nature of the Hobbs Act, *see Taylor*, 136 S. Ct. at 2079, the robbery of money that the defendants knew was intended to become drug proceeds, but for their interruption of the drug transaction, satisfies the interstate commerce requirement. *Cf., United States v. Lee*, 834 F.3d 145, 155 (2d Cir. 2016) (holding that it is "irrelevant" to the interstate nexus that no actual

drug proceeds were recovered).  The jury was entitled to find, then, that the defendants

knowingly stole, or attempted to steal, drugs or drug proceeds from Teasley.[5]

Viewing the evidence in the light most favorable to the government, with all logical

inferences drawn in its favor, the defendants did not meet their heavy burden of proving that the

government failed to establish the interstate commerce element of count three.  *Best*, 219 F.3d at

200.  I must not disturb a jury's "determination of the weight of the evidence … and competing

inferences that can be drawn from the evidence."  *Id*.  From the evidence presented, the jury was

entitled to infer that the defendants were knowingly targeting Teasley's drugs and/or drug

proceeds as part of the robbery.  Accordingly, the defendants' motions for judgment of acquittal

on count three are **denied**.

## III.    Motions for a New Trial

A.  <u>Standard</u>

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if

the interest of justice so requires."  Fed. R. Crim. P. 33.  Rule 33 gives the trial court "broad

discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of

justice."  *Sanchez*, 969 F.2d at 1413.  The test for determining if a new trial should be ordered

remains whether "it would be a manifest injustice to let the guilty verdict stand."  *Id.* (internal

quotation marks omitted).  In other words, in order to grant a new trial under Rule 33, the court

must answer "no" to the following question: "Am I satisfied that competent, satisfactory and

sufficient evidence in this record supports the jury's finding that this defendant is guilty beyond a

---

[5] Moreover, the defendants also robbed Teasley of his safe, in which Teasley kept his drugs and drug proceeds.
Although Ashanti testified that Cook told him there was nothing in the safe, it is irrelevant whether proceeds were
actually recovered, so long as the defendants intended to recover the proceeds.  *See Lee*, 834 F.3d at 155.
Accordingly, the jury was entitled to rely on the robbery of Teasley's safe, as well as or in lieu of the $1,100, in
finding that the government satisfied its burden on count three.

reasonable doubt?"  *Id.*  The Second Circuit has cautioned that "motions for a new trial are disfavored in this Circuit."  *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995).

B.  <u>Discussion</u>

Each of the three defendants also argue that he is entitled to a new trial for multiple reasons: (1) the verdict was against the great weight of the evidence; (2) the government made improper comments during its case-in-chief and its closing; (3) the government failed to preserve notes of an April 2011 interview of Ashanti, which constituted violations of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), and entitled them to an adverse inference instruction; (4) Mickens' closing argument was improperly limited; and (5) a joint trial subjected them to an unfair trial.  *See generally* Mem. in Supp. Cook Mot., Doc. No. 445; Mem. in Supp. Mickens Mot., Doc. No. 444; Mem. in Supp. Hunter Mot., Doc. No. 442.

1.  *Against the Weight of the Evidence*

The defendants argue first that the jury's verdict was against the great weight of the evidence.  Mem. in Supp. Cook Mot., Doc. No. 445 at 32; Mem. in Supp. Mickens Mot., Doc. No. 444 at 2; Mem. in Supp. Hunter Mot., Doc. No. 442 at 19.  The defendants reassert here their argument that Ashanti's testimony was incredible and defied physical realities, and other evidence contradicted his testimony.  *See id.*  As discussed with respect to the defendants' Rule 29 motions, Ashanti's testimony was not incredible as a matter of law and the jury's seeming reliance on that testimony in convicting the defendants was not a miscarriage of justice.  Therefore, the defendants are not entitled to a new trial on that basis.

2. *Government's Improper Comments*

The defendants argue next that the government made improper comments during its case-in-chief and during its closing argument which precluded the defendants from receiving a fair trial. *See* Mem. in Supp. Cook Mot., Doc. No. 445 at 40-46; Mem. in Supp. Mickens Mot., Doc. No. 444 at 8-9; Mem. in Supp. Hunter Mot., Doc. No. 442 at 8-15. Defendants "face a heavy burden" when seeking a new trial on the basis that government remarks amounted to prosecutorial misconduct. *United States v. Locascio*, 6 F.3d 924, 945 (2d Cir. 1993). "[T]he misconduct alleged must be so severe and significant as to result in the denial of their right to a fair trial." *Id.*; *see also United States v. Coplan*, 703 F.3d 46, 86 (2d Cir. 2012). Further, in evaluating a claim of prosecutorial misconduct, courts consider: "(1) the severity of the alleged misconduct; (2) the curative measures taken; (3) the likelihood of conviction absent any misconduct." *Locascio*, 6 F.3d at 945-46.

### a. Case-in-Chief

The defendants first take issue with various evidence elicited during the government's case-in-chief including testimony in which the defendants argue Special Agent Ryan James was bolstering the government's theory of the case and vouching for Ashanti's credibility. Mem. in Supp. Hunter Mot., Doc. No. 442 at 9-12. Further, the defendants argue that the government elicited "other act" evidence, under Rule 404(b), in violation of a pretrial ruling. *Id.* at 15.

### i. Agent James' Testimony

"It is well established that prosecutors may not 'vouch for their witnesses' truthfulness.'" *United States v. Carr*, 424 F.3d 213, 227 (2d Cir. 2005) (quoting *United States v. Modica*, 663 F.2d 1173, 1179 (2d Cir. 1981)); *see also United States v. Perez*, 144 F.3d 204, 210 (2d Cir. 1998) ("Attorney statements vouching for the credibility of witnesses are generally improper

because they 'impl[y] the existence of extraneous proof.'" (quoting *United States v. Rivera*, 22 F.3d 430, 438 (2d Cir. 1994)). The government is allowed, however, "to respond to an argument that impugns its integrity or the integrity of its case." *Carr*, 424 F.3d at 227. Furthermore, "[i]n a particular context … what might superficially appear to be improper vouching for witness credibility may turn on closer examination to be permissible reference to the evidence in the case." *Perez*, 144 F.3d at 210. Here, the defendants take issue with two pieces of James' testimony.

First, the defendants argue that the government was bolstering the "validity of the government's own investigation" when James testified that based on the information he had, it made sense for Desmond Wright's DNA to appear at the crime scene.[6] Mem. in Supp. Hunter Mot., Doc. No. 442 at 9-10 (citing Tr. 8/15/18, Doc. No. 406 at 1521-23). It is unclear, however, how the defendants suffered any prejudice from that testimony. The jury had already heard from other witnesses that Desmond Wright was at the crime scene and touched the vehicle. *See* Tr. 8/7/18, Doc. No. 400 at 138-39 (Officer Mark Puglielli testifying that Wright was at the crime scene); *id*. at 104-105 (Officer Rodney Gagnon testifying that Wright was at the crime scene). Accordingly, James' testimony was merely a comment on the evidence already in the case and was not impermissible vouching for the government's theory.

Second, the defendants argue that James was "vouch[ing] directly for the credibility of Jesus Ashanti" when he testified that he had independent knowledge regarding Ashanti's

---

[6] "Q: [D]o you recall, sir, whether or not there was any DNA that was obtained from Desmond Wright? A: Yes. . . . Q: But with respect to Desmond Wright, do you recall, sir, whether or not you were able to review records relating to what Desmond Wright had to say about some of these matters? A: Yes. Q: Now, I ask this question not to elicit hearsay, but with respect to what it is that Desmond Wright said … did that inform you at all concerning any DNA of Desmond Wright that was reported out? A: Yes. Q: And how so? What was it about the DNA report or the hit on Desmond Wright that in context made sense to you? A: Based on my review of the file and the statement given by Mr. Wright and the context of where the DNA was found, it made sense to me." Tr. 8/15/18, Doc. No. 406 at 1521-22.

concerns about Sutherland and why Ashanti originally implicated Sutherland in the Teasley murder.[7]  Mem. in Supp. Hunter Mot., Doc. No. 442 at 11-12 (citing Tr. 8/15/18, Doc. No. 406 at 1533-34).  Ashanti testified that he originally implicated Sutherland because he was afraid for his family if Sutherland was not incarcerated and, further, that Sutherland "seemed to be able to get addresses for" Ashanti.  Tr. 8/9/18, Doc. No. 402 at 841, 846-47.  Further, Ashanti testified that Sutherland's wife worked at the Hartford Police Department and "could provide information concerning people's addresses" and Sutherland had given Ashanti information in the past.  *Id.* at 847-48.  Based on a discussion outside the presence of the jury, it appears that the defendants were concerned that the government was inferring that Sutherland's wife was "up to no good" by providing information to Sutherland and others.  *Id.* at 844.  The defendants argue that James' testimony, that he "already [knew] about [the] situation" that Ashanti was concerned about with respect to Sutherland, improperly bolstered Ashanti's credibility.  That testimony does not inherently add credibility to Ashanti's statements that he falsely implicated Sutherland because he was afraid of him.  Even if it did, however, it did so to an inconsequential degree.  The defense was free to, and certainly did, strenuously cross-examine Ashanti (and James, for that matter) about Ashanti's reasons for implicating Sutherland and about Ashanti's admitted lies.  A minor comment like the one at issue here, within the context of weeks of testimony, surely cannot be construed as improperly vouching for a witness' credibility.  Even if it did move the needle, so to speak, on Ashanti's credibility, the defendants have not shown how they were prejudiced by this statement and, therefore, why they are entitled to a new trial. The reason for

---

[7] "Q: Do you recall, sir … did Ashanti tell you what he was concerned about [with respect to Sutherland]?  A: Yes.  Q: In that regard, when he told you what he was concerned about, at that very moment did you already know about that situation?  A: Yes."  Tr. 8/15/18, Doc. No. 406 at 1533-34.

Ashanti's fear of Sutherland does not bear on the fact that Ashanti did, in fact, falsely implicate Sutherland in a crime he did not commit, which the jury heard about.

James' testimony did not constitute improper vouching for the government's theory or Ashanti's credibility and, therefore, does not entitle the defendants to a new trial.

### ii. 404(b) Evidence

The defendants argue that Ashanti testified that he had participated in robberies in the past with Mickens and Cook which violated a pretrial ruling against the introduction of Rule 404(b) evidence and, therefore, the defendants are entitled to a new trial.

Federal Rule of Evidence 404(b) provides, in relevant part, that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Otherwise impermissible evidence may be admitted "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Prior to trial, the defendants moved to preclude evidence of another alleged shooting, robbery, and attempted kidnapping of Steven Keaton by Ashanti, Cook, Mickens, and Hunter. *See* 404(b) Mot., Doc. No. 204. At a hearing on the motion, I stated that bringing in evidence of the Keaton incident was "asking the jury to get emotional" and find that the defendants "are bad guys." Tr. 7/19/18, Doc. No. 397 at 55. Further, I stated that evidence of other acts, under Rule 404(b), should not come in on the government's case-in-chief because "all [the government is] doing is suggesting to the jury these are bad guys who do this all the time." *Id*.

The defendants take issue with two specific pieces of testimony. First, with respect to Cook, Ashanti testified that Cook called him and told him to "come to the block." Tr. 8/9/18,

Doc. No. 402 at 775.  When asked what he understood that to mean, Ashanti testified that "it was a money issue[; t]here was going to be a robbery."  *Id*. at 774-75.  Second, with respect to Mickens, Ashanti testified that he had heard Mickens use a Jamaican accent before.  Tr. 8/13/18, Doc. No. 403 at 923.  When asked how he knew that, Ashanti testified that "[d]uring a robbery" Mickens would use a Jamaican accent "to hide his voice."  *Id*.  The defendants argue that the government elicited that testimony and, in doing so, "effectively ignored the Court's ruling regarding the limit upon 404(b) evidence."  Mem. in Supp. Hunter Mot., Doc. No. 442 at 18.

The testimony however, does not run afoul of my ruling, or of Rule 404(b) more generally.  My concern in precluding evidence of the Keaton incident, for which the defendants had never been charged, was that the government was seeking to elicit extensive, specific evidence of another instance in order to prove that the defendants were guilty here.  Further, there was a concern that Ashanti's testimony about the Keaton incident would be used in an attempt to bolster his credibility with respect to the Teasley incident.  As mentioned in my oral ruling, I was also concerned that evidence of prior acts would unfairly prejudice the jury against the defendants and run the risk of the defendants being convicted as "bad" people, rather than on the government's proof.  Although both statements at issue implicate that last concern, neither was substantial enough to be prejudicial.  The statement about Cook says nothing about his prior involvement in robberies, but only what Ashanti understood a comment to mean.  At most, the testimony may suggest that *Ashanti* had taken part in robberies before, while saying nothing about Cook's history.  Although slightly less innocuous, the statement about Mickens also does not necessarily imply that Mickens and Ashanti had participated in *other* robberies together.  Regardless, though, it does not seem as though the government intentionally elicited either of the two statements from Ashanti.  With respect to the comment about Cook, it seems clear that the

government was intending to elicit from Ashanti that "the block" was Enfield Street.[8] *See* Tr. 8/9/19, Doc. No. 402 at 776. Further, with respect to the comment about Mickens, it seems clear that the government was intending to elicit from Ashanti that he was familiar with Mickens' voice.[9] *See* Tr. 8/13/18, Doc. No. 403 at 923.

Moreover, the evidence connecting both Cook and Mickens to the Teasley murder was substantial (*see* Part II of this Ruling) and, therefore, there is no risk here that the jury convicted either of the defendants based upon two relatively minor comments, which were not objected to, made by Ashanti during hours of testimony. Accordingly, the evidence was not unfairly prejudicial to the defendants, and does amount to a miscarriage of justice, nor does it entitle the defendants to a new trial.

b. Closing Argument

The defendants also take issue with multiple statements made during the government's closing argument which invited the jury to shift the burden to the defendants and speculate about evidence. *See* Mem. in Supp. Cook Mot., Doc. No. 445 at 40-46; Mem. in Supp. Mickens Mot., Doc. No. 444 at 8-9; Mem. in Supp. Hunter Mot., Doc. No. 442 at 8, 13.

Parties "are generally entitled to wide latitude during closing arguments, so long as they do not misstate the evidence." *United States v. Daugerdas*, 837 F.3d 212, 227 (2d Cir. 2016) (internal quotation marks omitted). "An improper summation will only warrant a new trial when the challenged statements are shown to have caused substantial prejudice to the defendant … rarely will an improper summation meet the requisite level of prejudice." *United States v. Mapp*,

---

[8] "Q: And what did you understand that to mean, 'come to the block'? A: It was – it was a money issue. There was going to be a robbery. Q: And the block refers to what? A: Enfield Street." Tr. 8/9/19, Doc. No. 402 at 776.
[9] "Q: And what's the basis of your knowledge that [Mickens] sometimes would speak with a Jamaican accent? A: During a robbery, to hide his voice. Q: You knew his voice? A: Yes." Tr. 8/13/18, Doc. No. 403 at 923.

170 F.3d 328, 337 (2d Cir. 1999) (internal citations omitted). "Remarks of the prosecutor in summation do not amount to a denial of due process unless they constitute 'egregious misconduct.'" *United States v. Shareef*, 190 F.3d 71, 78 (2d Cir. 1999) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974)). "The law has long recognized that summations—and particularly rebuttal summations—are not detached exposition[s], … with every word carefully constructed … before the event." *United States v. Farhane*, 634 F.3d 127, 167 (2d Cir. 2011) (internal citations and quotation marks omitted). "Precisely because such arguments frequently require 'improvisation,' courts will 'not lightly infer' that every remark is intending to carry 'its most dangerous meaning.'" *Id.* (quoting *Donnelly*, 416 U.S. at 646-47). The defendant must show that the comment at issue, "when viewed against the entire argument to the jury … and in context of the entire trial, was so severe and significant as to have substantially prejudiced him, depriving him of a fair trial." *Id.* (internal citations and quotation marks omitted).

    i.  <u>Burden-Shifting</u>

The defendants argue first that the government made improper remarks during its closing argument about the defendants' lack of alibi that amounted to burden shifting. Mem. in Supp. Cook Mot., Doc. No. 445 at 40-44; Mem. in Supp. Mickens Mot., Doc. No. 444 at 8; Mem. in Supp. Hunter Mot., Doc. No. 442 at 13.

The Second Circuit is clear that "a prosecutor 'must avoid commenting in a way that trenches on the defendant's constitutional rights and privileges.'" *United States v. Fell*, 531 F.3d 197, 221 (2d Cir. 2008) (quoting *United States v. Parker*, 903 F.2d 91, 98 (2d Cir. 1990)). Specifically, the government cannot "comment on the failure of the defendant to testify … or suggest that the defendant has any burden of proof or any obligation to adduce any evidence whatsoever." *Id.* (internal quotation marks omitted). "A prosecutor's commentary about a

defendant's lack of evidence becomes prejudicial only if the jury would 'naturally and necessarily interpret the Government's summation as a comment on the defendant's failure to testify' or if the evidence that the defendant has not produced was exclusively in his control." *Daugerdas*, 837 F.3d at 227 (quoting *United States v. McDermott*, 918 F.2d 319, 327 (2d Cir. 1990)).

During its closing argument, after a review of the evidence, the government stated: "The independent evidence thus shows without question that Ashanti's testimony about who participated in the kidnapping, robbery and murder of Charles Teasley is strongly corroborated in all material respects." Tr. 8/20/18, Doc. No. 409 at 1935. Further, the government stated:

> If Ashanti is making this up as to who participated in the evidence, why choose four other people? Why take the risk that Mr. Cook, Mr. Mickens, or Mr. Hunter, or for that matter Lee, would have a solid alibi, right, something that was incontrovertible? They were out of state. They were in the hospital. They were at some public event. They were at some location where it could be readily proven that they were there. Why would you take that risk, not naming one or two other people but a number of people?

*Id.* at 1935-36. The defendants did not object at the time, but objected outside the presence of the jury after the government's closing argument concluded, and moved for a mistrial, stating: "[C]learly the government crossed the line there and engaged in a transparent request that the jury shift the burden to the defendants in terms of putting on a defense." *Id.* at 1940. I denied the motions and overruled the objecting stating:

> There was no argument made that the defendants should have put on an alibi defense. Instead, the point was made about the number of persons that Ashanti put into the mix. . . . And so it was close to the line, but I don't think it went over the line. . . . I believe that was an appropriate way to argue for the credibility of Mr. Ashanti.

*Id.* at 1940-41.

Thereafter, during its rebuttal argument, the government stated that the "government and defense are in total agreement" that the defendants do not have to put on any evidence. *Id.* at 2043. Further, the government stated:

> The defendants have no obligation whatsoever to put on any evidence at any time. The burden is on the government, and it always remains with the government to prove the defendant guilty beyond a reasonable doubt. What the government has said in that connection, however, was if Ashanti were going to make something up about who was involved in this, why would he pick multiple people? Why would he identify multiple names and then risk the possibility that one or another of those persons was, as I say, in the hospital –

*Id.* At that point, the defense objected, and the government withdrew the statement. *Id.* The defendants again moved for a mistrial or, in the alternative, a curative instruction. *Id.* at 2068. I denied both motions. *Id.* at 2070.

The defendants have not met the high burden to show that the government's remarks about Ashanti's testimony require a new trial. Although I reiterate that the government's comments were "close to the line," this is not a situation in which the jury "naturally and necessarily" would have interpreted the government's comments to be about the defendants' failure to testify or failure to put forth an alibi, but simply a comment about Ashanti's testimony and what evidence the jury could use in assessing his credibility. *Daugerdas*, 837 F.3d at 227. There was no argument by the government that the defendants should have put on an alibi defense and, therefore, the government's comments certainly did not rise to a level of "egregious conduct", *Shareef*, 190 F.3d at 78, particularly when viewed in connection with the government's statements in its rebuttal argument that the defendants have no burden to put forth any evidence.

Further, I instructed the jury many times throughout the jury charge that the government has the burden in a criminal trial, not the defense. *See* Final Jury Instructions at 9 ("The burden

never shifts to the defendants for the simple reason that the law never imposes on a defendant in a criminal case the burden of calling any witnesses or producing any evidence."); *id*. at 10 ("The government has th[e] burden [of proof] throughout the trial. The defendants never have any burden to prove their innocence, to produce any evidence at all, or to testify."); *id*. at 11 ("The burden of proof never shifts to a defendant, which means that it is always the government's burden to prove each of the elements of the crimes charged beyond a reasonable doubt."); *id*. at 35-36 ("Th[e] burden [of proof] remains with the government throughout the entire trial and never shifts to a defendant. A defendant is never required to prove that he is innocent."); *id.* at 42 ("You should … remember my instruction that the law does not impose on a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence."). Moreover, the jury was specifically instructed that "a defendant has no obligation to testify, because it is the government's burden to prove the defendant guilty beyond a reasonable doubt." *Id.* at 35.

I decline to ascribe the "most dangerous meaning" to the government's comments regarding Ashanti's credibility, particularly in light of the jury instructions and the government's own comment on the defendants' lack of burden. *Farhane*, 634 F.3d at 167. The defendants have not shown that the comment, in the context of the entire trial, "was so severe and significant as to have substantially prejudiced" them. *Id*. Accordingly, they are not entitled to a new trial based on the government's alleged burden shifting.

### ii. Inviting Speculation

The defendants also argue that the government's comments in its closing argument invited the jury to speculate in two respects.

First, the defendants argue that the government "invited the jurors to speculate about issues not in evidence when the prosecutor argued that the government had additional evidence corroborating Ashanti's motive for implicating Sutherland … but could not present it due to defense counsel's objections." Mem. in Supp. Cook Mot., Doc. No. 445 at 45-46. With respect to this argument, Cook's counsel stated during closing argument that the government

> [S]poke about … [Sutherland's] wife, Ms. Walton. Has there been a single piece of evidence actually demonstrating that this woman shared information from a database and put it out on the street? There's claims out there that she may have had access, but is there actually any evidence that she did what Ashanti claims she did?

Tr. 8/20/18, Doc. No. 409 at 1967. In its rebuttal argument, the government highlighted that portion of Cook's closing and stated:

> [Cook's counsel] also said to you that with respect to Mr. Ashanti's reasoning for initially putting Sutherland into the case, he said words to the effect or along the lines of: Was there any actual piece of evidence submitted in this case regarding Kim, Kim Walton? Do you remember him saying that? Again, that's why the judge instructs the jury in this case … that the arguments of counsel are not evidence, because that question was specifically intended to suggest that no such evidence exists, when you know, because you were here and listened to the testimony of Ashanti, that when the prosecution asked Mr. Ashanti what he could tell you regarding Kim Walton, the defense objected to it and wouldn't permit the evidence to come in.

*Id.* at 2045. Cook's objection to that statement was overruled. *Id.* at 2046, 2076. The comment at issue in the government's argument here was not egregious and does not entitle the defendants to a new trial. The government was simply responding to an argument from the defendants that attempted to impugn the integrity of the government's case, which the government was allowed to do. *Carr*, 424 F.3d at 227. Further, the government is granted particular leeway with respect to its rebuttal argument. *Farhane*, 634 F.3d at 167. Accordingly, the defendants' argument here is unavailing.

Second, the defendants argue that the government "improperly invited jurors to speculate … that first responders moved the passenger seat in Teasley's car." Mem. in Supp. Mickens

Mot., Doc. No. 444 at 9. With respect to this argument, Mickens' counsel stated during closing argument that, contrary to Ashanti's testimony, "[t]he evidence … strongly supports the conclusion that Gerund Mickens was not in the front seat of the Teasley car at all on January 9, 2009." Tr. 8/20/18, Doc. No. 409 at 1992. As support, Mickens' counsel highlighted the fact that Mickens "is a tall man" and there was "not very much room" in the passenger seat. *Id.* at 1992-93. Mickens' counsel stated further: "Ask yourselves this: How did Gerund Mickens even get into this car with the seat up as far as it is? And why, if he could accomplish that feat, why didn't he move the seat back?" *Id.* at 1993. In its rebuttal argument, the government stated:

> The difficulty with the argument that [Mickens' counsel] made is we just don't know from the evidence here who moved that seat and when. So, for example, you recall the testimony of the first responder to the scene indicated that the paramedics were already there when he got there. Clearly, when the photographs were taken in this instance, the crime scene tape was already up. People had been inside the vehicle. So you just don't know who moved that seat or may have moved that seat and when, and it calls for pure speculation that it never moved when the paramedics, for example, went into the car to see if Mr. Teasley was dead or alive.

*Id.* at 2050.

Mickens argues that Officer Gagnon specifically testified that he was tasked with preventing contamination at the crime scene and, therefore, the government's speculation that someone could have moved the seat was contrary to the evidence. Mem. in Supp. Mickens Mot., Doc. No. 444 at 9. Although Gagnon did testify to that effect (*see* tr. 8/7/18, doc. no. 400 at 115, 126), he also testified that there were other people on the scene when he arrived (*id.* at 103-05), that he could not "control who g[ot] to the scene before [him]" (*id.* at 115), that the car looked different in the crime scene photos than when he arrived because a door was closed (*id.* at 117-18). Further, Gagnon was asked on cross-examination whether the EMTs "would necessarily need to go into the vehicle" "in order to determine whether or not the person laying in the back of the vehicle was deceased" to which Gagnon replied yes. *Id.* at 120-21. Further, he testified

that "somebody was inside the vehicle also before the crime scene detectives arrived to work on the vehicle." *Id.* at 121. The government, therefore, did not misstate the evidence, as Mickens suggests, but merely made a "permissible reference to the evidence in the case." *Perez*, 144 F.3d at 210.

Accordingly, the defendants are not entitled to a new trial on the grounds that the government invited the jury to improperly speculate about the evidence in the case.

### 3. Brady *Violation*

The defendants argue next that the government engaged in a *Brady* violation when it failed to create a written report ("a 302"[10]) of the April 2011 meeting with Ashanti in which he recanted his statement that Sutherland was involved in Teasley's murder. Mem. in Supp. Cook Mot., Doc. No. 445 at 32. The defendants also argue that the jury should have been given an adverse inference instruction regarding that failure. *Id*. at 38. Further, the defendants argue that the government's evidence about that meeting was intended to improperly bolster Ashanti's credibility. Mem. in Supp. Hunter Mot., Doc. No. 442 at 2-6.

On August 5, 2018, the defendants jointly moved for a release of *Brady* materials in the government's possession, including FBI notes from an April 2011 meeting with Ashanti in which he recanted his statements implicating Sutherland as part of the Teasley murder. *See* Brady Mot., Doc. No. 265. In response, the government stated that there were no additional notes created but provided that the meeting occurred on April 15 or April 25, 2011[11] and present at the meeting were Ashanti, his attorneys, Assistant United States Attorney Brian Leaming, Agent Aldenberg, and two detectives from Hartford police. *See* Gov't Reply to Brady Mot.,

---

[10] A form FD-302 is a "report of [an] interview." Tr. 8/14/18, Doc. No. 404 at 1323-24.
[11] Aldenberg testified that there was supposed to be a meeting on April 15, 2011, but it did not occur. Tr. 8/14/18, Doc. No. 404 at 1368.

Doc. No. 273. Further, the government stated that AUSA Leaming "wanted to clarify some information previously provided by Ashanti and so arranged to have Ashanti produced" and, while at the meeting, Ashanti "disclosed that Sutherland was not involved" in Teasley's murder, and that Ashanti "provided the information voluntarily and not as the result of being confronted with any information." *Id*. The government stated that it provided the defendants with an affidavit from Aldenberg, who was present for the meeting, in which he notes that Ashanti recanted statements regarding Sutherland's involvement. *See id*. The affidavit was prepared in support of buccal swab warrants for Cook and Mickens. Tr. 8/8/18, Doc. No. 401 at 11; Tr. 8/14/18, Doc. No. 404 at 1308-09.

After argument on the issue (*see* tr. 8/8/18, doc. no. 401 at 7-23), I ordered the government to prepare a 302 about the April 2011 meeting with Ashanti, which it did. Tr. 8/8/18, Doc. No. 401 at 172. Further, the government called Aldenberg as a witness who testified about his meeting with Ashanti on April 25, 2011. Tr. 8/14/18, Doc. No. 404 at 1259, 1306. He testified that Ashanti "was brought into Hartford federal courthouse with his attorneys, and he told us that he had – he told – his attorneys told the prosecutors he had something to discuss. When we brought him in, he told us that he had placed Cinque Sutherland at the scene of the Teasley murder and that, in fact, was not true." *Id.* at 1306. Further, Aldenberg testified that Ashanti had not "been confronted by anybody to cause him to make that admission." *Id*. Aldenberg testified further that he did not create a 302 for the meeting, although he should have, but he did not recall anything additional being said in the meeting beyond Ashanti recanting his statements about Sutherland. *Id.* at 1309. On cross-examination, Aldenberg again testified that he did not prepare a 302 after the April 25, 2011 meeting with Ashanti, but when asked whether he did so "because an FD-302 might have been extremely harmful to the process of the

investigation", Aldenberg responded "absolutely not." *Id.* at 1327. Aldenberg testified further

that his recollection was that the meeting was scheduled specifically so that Ashanti could recant

his statements about Sutherland because Ashanti "had a concern" and "needed to tell [the

government] something." *Id.* at 1328. Aldenberg testified that he was "sure [he] took notes" at

the meeting but did not know where they were despite looking for them for two years. *Id.* at

1349-51.

On August 16, 2018, the defendants moved for an instruction to the jury "that it may

properly make an adverse inference from both the Government's failure to preserve *Brady*

material and that it may infer that such information, if provided, would have been helpful to the

defense." Adv. Inf. Mot., Doc. No. 291. I denied that request. Tr. 8/17/18, Doc. No. 408 at 94.

a. Failure to Create 302

The defendants argue that the government's failure to create and preserve notes of its

April 2011 meeting with Ashanti violated their due process rights in violation of *Brady v.

Maryland*, 373 U.S. 83 (1963), and the Sixth Amendment Confrontation Clause, and entitles

them to a new trial. Mem. in Supp. Cook Mot., Doc. No. 445 at 32.

"*Brady* and its progeny require the Government to disclose material information that is

'favorable to the accused, either because it is exculpatory, or because it is impeaching.'" *United

States v. Rodriguez*, 496 F.3d 221, 225 (2d Cir. 2007) (quoting *Strickler v. Greene*, 527 U.S. 263,

281-82 (1999)). "A *Brady* violation occurs only where there is a 'reasonable probability' that a

different verdict would have resulted from disclosure of the information that the defendant

claims was suppressed." *Id.* at 227 (quoting *Strickler*, 527 U.S. at 281). Although the

government is required to disclose to the defendant any lies told by witnesses during an

interview, the Second Circuit has declined to extend *Brady* and the Confrontation Clause to obligate the government "to take notes of all interviews of potential witnesses." *Id*. at 225.

Accordingly, the government here was under no obligation to take notes of the April 25, 2011 meeting with Ashanti. It was, of course, obligated to disclose to the defendants that Ashanti admitted to lying about Sutherland's involvement in Teasley's murder. The government did, in fact, disclose that to the defendants through a written submission (*see* Gov't Reply to Brady Mot., doc. no. 273), through a 302 written after the fact (*see* 302, Ex. 1 to Adv. Inf. Mot., Doc. No. 292), and through testimony of both Aldenberg and Ashanti. The defendants were well aware of Ashanti's admission that he lied about Sutherland's involvement in the murder and vigorously cross-examined him about that fact. There is nothing in the record to suggest that there was anything else said during the April 25, 2011 meeting that the defendants did not have access to that would have either been exculpatory or impeaching. In fact, both Ashanti and Aldenberg explicitly testified that at the April 25, 2011 meeting, Ashanti did not change his statements with respect to Cook's, Mickens', or Hunter's involvement in Teasley's murder. Further, any argument that the government's disclosure was not timely is unavailing. Mere days after the meeting at which Ashanti recanted, that information was submitted in a search warrant affidavit for buccal swabs for Cook and Mickens. That affidavit was disclosed during pretrial discovery. Presumably, then, the defendants were well aware of Ashanti's recantation and admitted lies well before trial.

The government made numerous representations before and during trial that it turned over any written material it had with respect to Ashanti's meetings with law enforcement and disclosed the substance of the April 25, 2011 meeting for which there was no written record. They were under no obligation to do anything further, and there is nothing in the record to

suggest that they were in any way being untruthful with respect to the April 25, 2011 meeting. It is unfortunate that there was not a contemporaneous memorialization of the meeting, but the government made efforts to rectify the situation, albeit after the fact, and there has been no showing that the defendants suffered any prejudice. Moreover, there is nothing to suggest that if the defendants received a contemporaneous, and perhaps a more detailed, report of the April 25, 2011 meeting, that there was a reasonable probability of a not guilty verdict. Accordingly, the defendants are not entitled to a new trial on this claim.

   b. Failure to Give an Adverse Inference Instruction

   Furthermore, the defendants argue that they are entitled to a new trial because I erroneously denied their request for an adverse inference instruction. Mem. in Supp. Cook Mot., Doc. No. 445 at 38. In seeking an adverse inference based on the alleged destruction of evidence, the defendants must establish: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Chin v. Port Authority of New York & New Jersey*, 685 F.3d 135, 162 (2d Cir. 2012). "[T]he 'culpable state of mind' factor is satisfied by a showing that the evidence was destroyed 'knowingly, even if without intent to [breach a duty to preserve it], or negligently.'" *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 108 (2d Cir. 2002) (quoting *Byrnie v. Town of Cromwell*, 243 F.3d 93, 109 (2d Cir. 2001)). However, "a finding of gross negligence merely permits, rather than requires, a district court to give an adverse inference instruction." *Chin*, 685 F.3d at 162. The Second Circuit has held that "a case-by-case approach to the failure

to produce relevant evidence, at the discretion of the district court, is appropriate." *Id.* (internal quotation marks omitted).

Even assuming that any notes from the April 25, 2011 meeting were "destroyed" by virtue of having been lost, there is no evidence that the government acted with a culpable state of mind. There was no evidence that Aldenberg, or any other government official, acted with gross negligence or acted intentionally to destroy any notes from the April 25, 2011 meeting. The evidence reflected that Aldenberg was sure he had taken notes, but could not find them despite looking for them for years. The government then provided the relevant information via other means, as discussed previously. There was simply no evidence, beyond the defendants' speculation, that the government engaged in any unscrupulous and/or nefarious behavior with respect to notes from that meeting. Accordingly, I declined to give the jury an unwarranted adverse inference instruction. The defendants are not entitled to a new trial on that basis.

### c. Bolstering

The defendants also argue that the government impermissibly bolstered Ashanti's credibility by "repeatedly insisting that Mr. Ashanti had come forward of his own accord to remove Cinque Sutherland as one of the participants in the kidnap[p]ing, robbery, and murder of the victim." Mem. in Supp. Hunter Mot., Doc. No. 442 at 3. The defendants argue that the government called the April 25, 2011 meeting, and any testimony that Ashanti requested the meeting was incorrect and misleading. *Id*. at 3-6. Further, the defendants argue that, contrary to the government's assertions, Ashanti's disclosure was prompted by a confrontation by the government. *Id*. at 6-7.

There does seem to be some conflicting information about who called the meeting on April 25, 2011. *See* Tr. 8/14/18, Doc. No. 404 at 1328 (Aldenberg testifying that his recollection

was that Ashanti called the meeting because he "needed to tell [the government] something"); 302, Ex. 1 to Adv. Inf. Mot., Doc. No. 292 (meeting was called because Ashanti "had something to discuss" with the government); Gov't Reply to Brady Mot., Doc. No. 273 (the government "wanted to clarify some information previously provided by Ashanti and so arranged to have Ashanti produced" and then Ashanti disclosed the information about Sutherland). Regardless of who called the meeting, however, the evidence is consistent that Ashanti was acting on his own volition when he recanted his statements about Sutherland's involvement. Tr. 8/13/18, Doc. No. 403 at 914 (Ashanti testifying that he recanted his statements about Sutherland without any confrontation from the government); *id*. at 915 (Ashanti testifying that he told his lawyer about Sutherland during a break in a meeting and then his lawyer called the government back in so Ashanti could recant); Tr. 8/14/18, Doc. No. 404 at 1306, 1328 (Aldenberg testifying that meeting was called because Ashanti had something to discuss and not because Ashanti had "been confronted by anybody to cause him to make that admission"); Gov't Reply to Brady Mot., Doc. No. 273 (Ashanti "provided the information voluntarily and not as the result of being confronted with any information"); 302, Ex. 1 to Adv. Inf. Mot., Doc. No. 292 (Ashanti "had something to discuss" with the government). The defendants are merely speculating, without any supporting evidence, that Ashanti was somehow prompted by the government to confess about his inaccurate implication of Sutherland. Although the government must not "vouch for their witnesses' truthfulness", *Carr*, 424 F.3d at 227, this was not a situation in which the government did so. Accordingly, the defendants are not entitled to a new trial.

4. *Mickens' Closing Argument*

Mickens argues that his closing argument was improperly limited and, therefore, he was precluded from articulating his theory of the case. Mem. in Supp. Mickens Mot., Doc. No. 444

at 4. In its closing argument, Mickens' counsel "attempted to articulate an important aspect of the defense theory of the case, that the Government investigation had been incomplete and inadequate, particularly in failing to explore leads regarding alternate suspects[.]" *Id.* In calling into question the government's investigation techniques, counsel for Mickens, Attorney Richard Reeve, argued in closing:

> The government never got buccal swabs from Douglas Lee. They never developed a profile, and they never tested that profile against all the DNA profiles developed in this case. Well, Kim Brookens told the police that Mr. Teasley was going to Lee's house to buy drugs. We know that there were unknown DNA profiles on those zip ties. In fact, there was a profile right where those zip ties would be pulled tight by someone who was restraining Mr. Teasley. Wouldn't you test the Lee DNA against all DNA samples in this case if you were doing an open, thorough investigation?
>
> But we know why it wasn't done here because Agent James already told us. . . . Ashanti didn't say Lee was in the car, he didn't say Lee was in the driveway so we didn't look.
>
> That's how the government proceeded. The question for you is, is that thorough enough for you, given the magnitude of the test you have to perform here?
>
> And there's no evidence here that the government ever investigated other obvious suspects. Number one, the guys who were robbed by Mr. Teasley and Desmond Wright. Kim Brookens identified them as the Jamaicans, and so I'll reference them in that way here. They had a clear motive to go after Mr. Teasley. Is it at all likely –

Tr. 8/20/18, Doc. No. 409 at 1977-78. At that point, I stopped the argument and called counsel to a sidebar and the following colloquy occurred:

| | |
|---|---|
| The Court: | The government has no obligation to put on testimony or other evidence about eliminating other suspects. |
| Mr. Reeve: | Absolutely. |
| The Court: | So how is it proper for you to suggest that your client should be found not guilty because they failed to do so? |
| Mr. Reeve: | Because, Your Honor, the law has been very consistent for some time, and the Supreme Court indicated in *Kyles v. Whitley* that it is totally fair game to talk about the flaws in the government investigation. Your Honor has instructed [the jury] that the lack of evidence can itself create reasonable doubt. And so the investigative steps that the government takes are critical. . . . |
| The Court: | I think *Kyles v. Whitley* says that if you don't investigate these defendants. It doesn't say that you have free rein to come in and suggest, without any |

> evidence of your own, that someone else committed this crime; that the government has somehow engaged in wrongful conduct because they have failed to put on evidence at this trial of these three defendants that somebody else didn't commit the crime, when they have no obligation to do so. You have the right, as a defense, to put on evidence – the Jamaicans did it, or Lee did it, or whoever did it – but you didn't do that. So you now can't fault the government for not putting on a rebuttal case to evidence that you didn't put in.
>
> …
>
> Mr. Reeve: Now, if the Court is saying I can't go into what they didn't do because we haven't developed evidence –
>
> The Court: No, no. You're not hearing what I'm saying. You can complain … about the inadequacy of the investigation with respect to your client or these other defendants. Where I'm having a problem is you're now saying that they didn't eliminate some other suspect. There is no obligation for them to have put on any evidence that anybody either was a suspect or what they did to eliminate them as a suspect.
>
> …
>
> The Court: You're asking [the jury] to speculate, and frankly you are – it's almost an ad hominem attack on the government, both of which are improper. There just is no basis for pulling out, at closing argument, a theory that has never been presented, people who the jury is left to speculate about, and then condemning the government for not doing something with respect to them, when the government had no notice they were supposed to put on a case that they eliminate all other suspects.

*Id.* at 1979-82. Further, I stated that the defense was "permitted to argue from evidence actually in the record that some other specified person" murdered Teasley, but they were not permitted to point to some other suspect "about which there is no evidence in the record" and then condemn the government for conducting "an insufficient investigation" against a person not on trial. *Id.* at 1982-83. Thereafter, the sidebar ended, and Mickens' closing argument continued.

Parties "are generally entitled to wide latitude during closing arguments, so long as they do not misstate the evidence", *Daugerdas*, 837 F.3d at 227, but "[a] district court has 'broad discretion' in controlling summation." *United States v. Zodhiates*, 235 F. Supp. 3d 439, 461 (W.D.N.Y. 2017) (quoting *Herring v. New York*, 422 U.S. 853, 862 (1975)), *aff'd*, 901 F.3d 137 (2d Cir. 2018), *cert. denied sub nom, Zodhiates v. United States*, 139 S. Ct. 1273 (2019).

"[A]mong its duties in presiding over the parties' summations, a district court 'has a duty to control final argument and to prevent any improper arguments.'" *Id.* (quoting *United States v. Spillone*, 879 F.2d 513, 518 (9th Cir. 1989)).

In *Kyles v. Whitley*, the Supreme Court held that it was appropriate for a defendant to "attack not only the probative value of crucial physical evidence and the circumstances in which it was found, but the thoroughness and even the good faith of the investigation as well." 514 U.S. 419, 445 (1995). In *Kyles*, the government had failed to provide to the defendant various exculpatory evidence including eyewitness statements and various statements made by an informant, "Beanie," who was "essential" to the investigation and who "made the case" against the defendant, and whose statements were "replete with inconsistencies[.]" 514 U.S. at 445. The Court stated that had the defense had Beanie's various statements, it could have called him as an adverse witness, where he would have been "trapped by his inconsistencies," or the defense could have used Beanie's statements in examining the police "on their knowledge of Beanie's statements and so have attacked the reliability of the investigation in failing even to consider Beanie's possible guilt and in tolerating (if not countenancing) serious possibilities that incriminating evidence had been planted." *Id.* at 445-46. The issue the Court was addressing was Kyles' ability to attack the investigation *against him* based on the information it had with respect to Beanie, of which the failure to disclose constituted *Brady* violations. Importantly, the Court noted that Beanie's statements were "affirmatively self-incriminating" and, further, that there was evidence that Beanie planted evidence to frame Kyles, both of which were exculpatory for Kyles. *Id.* at 446-47.

*Kyles* does not stand for the proposition that a defendant can call into question the government's investigative techniques based on mere speculation with respect to an alternative

suspect, about whom there was no evidence in the record.  Quite the contrary, in *Kyles*, the

reliability of the government's investigation into the defendant's guilt was inextricably

intertwined with the *Brady* violations with respect to Beanie's inconsistent statements about

Kyles.  *Id.* at 441.  The defendants here were certainly allowed to, and did, call into question the

government's investigation of *them*.  What they cannot use *Kyles* for, however, is an attempt to

argue a third-party committed the crimes, about whom there is no evidence in the record, and ask

the jury to speculate about the government's investigation into that "suspect."  Further, the

government is entitled to "respond to an argument that impugns … the integrity of its case."

*Carr*, 424 F.3d at 227.  Allowing the government only a rebuttal argument to respond—which

the Second Circuit has acknowledged requires "improvisation" and does not allow the

government to "carefully construct[]" every word—would not afford the government an

adequate opportunity to do so.  *Farhane*, 634 F.3d at 167.  Had the defendants wanted to suggest

to the jury that there was another person or people who were responsible for Teasley's murder,

they could have done so at any point before their closing argument by presenting evidence or

conducting cross-examination about that person.

I allowed Mickens' attorney to call into question the adequacy of the investigation with

respect to the defendants, but stopped him when he began making an "improper argument[]",

*Zodhiates*, 235 F. Supp. 3d at 461, in which he sought to have the jury speculate about the guilt

of the Jamaicans, for which there was simply no support in the record.  Accordingly, the

defendants are not entitled to a new trial.

5. *Joint Trial*

Lastly, Cook argues that a joint trial with his co-defendants subjected him to an unfair trial.[12] Mem. in Supp. Cook Mot., Doc. No. 445 at 47-49. Specifically, Cook argues that there was no forensic evidence tying him to the scene of the crime and, therefore, the jury would convict him "not on the basis of the evidence relating to him, but as a result of his connection to his brother Mickens and, to a lesser extent, Hunter." *Id*. at 47. The defendants moved pretrial to sever their trials, which I denied. *See* Cook Mot. to Sever, Doc. No. 145; Hunter Mot. to Sever, Doc. No. 136; Ruling, Doc. No. 178.

As Cook acknowledges, however, "'disparity in the quantity of evidence and of proof of culpability are inevitable in any multi-defendant trial, and by themselves do not warrant a severance.'" Mem. in Supp. Cook Mot., Doc. No. 445 at 48 (quoting *United States v. Cardascia*, 951 F.2d 474, 483 (2d Cir. 1991)); *see also United States v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003) ("[D]iffering levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials."). There was ample evidence, beyond Cook's familial relationship to Mickens, from which the jury could find that Cook was involved in Teasley's murder. *See* Part II. Moreover, even absent any DNA evidence with respect to Cook, this is not a situation in which the defendants have "markedly different degrees of culpability." *Zafiro v. United States*, 506 U.S. 534, 539 (1993).

Furthermore, "less dramatic measures [than a severance], such as limiting instructions, often will suffice to cure any risk of prejudice." *Id*. Here, the jury was instructed that it "must consider the case against each of [the] three defendants separately" and that "[e]ach defendant is

---

[12] Cook's argument is specific to the personal prejudice he allegedly suffered from a joint trial, and it is unclear whether either of the other two defendants join in this argument. Even if they had, however, none of the defendants is entitled to a new trial on the basis of any perceived prejudice from a joint trial.

to be considered as if he were on trial alone for the offenses for which he stands charged."  Final Jury Instructions at 8-9.  Accordingly, a new trial is not warranted.

For the reasons stated above, the defendants' Motions for a New Trial are **denied.**

## IV.  Conclusion

For the foregoing reasons, the defendants' Motions for Judgment of Acquittal and/or New Trial (doc. nos. 330, 333, 334) are **denied.** The Clerk is directed to schedule the defendants' sentencing proceedings.

So ordered.

Dated at Bridgeport, Connecticut, this 6th day of September 2019.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge